Mary TWYMAN, Appellant,

v.

Naomi JOHNSON, Appellee.

Naomi JOHNSON, Cross–Appellant,

v.

Mary TWYMAN, Cross–Appellee.

Nos. 93–CV–1092, 93–CV–1441.

District of Columbia Court of Appeals.

Argued Dec. 21, 1994.
Decided March 13, 1995.

Stephen H. Abraham, with whom J. Gordon Forester and Richard W. Luchs, Wash-

ington, DC, were on the brief, for appellant/cross-appellee.

Anthony E. Grimaldi, Fairfax, VA, and Stephen Hessler, Washington, DC, for appellee/cross-appellant.

Before TERRY, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

On this appeal from a jury verdict that, among other things, awarded the plaintiff-appellant damages for retaliation under the Rental Housing Act of 1985 (the Act), the primary issues are whether the trial judge erred in directing a verdict against plaintiff on her claim for negligence and whether an independent cause of action for retaliation may be maintained under the Act. We answer both questions in the negative, and therefore affirm in part and reverse in part the judgment of the trial court.

## I.

Plaintiff Mary Twyman has been the tenant of defendant Naomi Johnson since 1974, when the Twymans moved into their apartment pursuant to an oral lease between Mr. Twyman and Mr. Johnson, both since deceased. When Mrs. Johnson took over management of the rental property in 1988, Mrs. Twyman pointed out to her several problems with the residence, including defects in the rear porch and steps leading to the ground from the porch. On November 1, 1989, Mrs. Twyman was carrying trash down the rear steps to the back alley when she fell on the second or third step and sustained injuries to her left wrist and hand. In August 1991, she filed suit against Johnson in Superior Court for negligence resulting in that injury and for breach of the implied warranty of habitability.[1] Meanwhile, in June 1991 the District of Columbia responded to a complaint by Twyman and issued a Housing Deficiency Notice to Johnson regarding the conditions at the Twyman residence. At that time, Twyman began withholding rent.

In November and December of 1991, Johnson filed two consecutive complaints for possession in Superior Court based on Twyman's non-payment of rent, each indicating, incorrectly, that statutory notice had been waived in writing. As the complaints were also defective in the identity of the person verifying them, Johnson voluntarily dismissed both, and the trial court awarded sanctions against Johnson's then-counsel, Kane, for attorney's fees. Twyman then amended her civil complaint to add claims for abuse of process and retaliation, alleging that the possessory actions had been motivated by her recourse to legal action. After serving Twyman with the proper 30–day notice to vacate, Johnson filed a third landlord and tenant complaint based on non-payment of rent. Besides answering the complaint, Twyman counterclaimed both for a rent abatement dating back three years because of the housing code violations and for damages for retaliation. The landlord and tenant action was consolidated with the civil action for trial.

At trial, Twyman's expert, Gregory Harrison, a consulting engineer, testified about the sub-standard conditions of the back steps, stating that they lacked dimensional uniformity of the risers and treads, were not slip resistant, and were not protected by a handrail, only a "guardrail." According to Harrison, the step on which Twyman said she fell—the second or third depending on how the steps were counted—was unsafe and violated the housing code. Other than Twyman, however, no one had personally witnessed the fall and could testify how it had happened.[2] Twyman, for her part, was frank in testifying that she did not know what had caused her to fall. On direct examination she recalled the approximate step from which she had fallen ("the second or third step—I don't know which one of the two"), but stated: "I was just going down the steps and I just fell—that's all I remember." On cross-examination she again stated, "I don't know what caused me to fall," and in response to

---

1. As to the latter cause of action, *see George Washington Univ. v. Weintraub,* 458 A.2d 43 (D.C.1983).

2. Twyman's daughter had preceded her down the steps but had turned a corner before the fall and was unable to describe the accident.

the question whether she had "any explanation as to why [she] fell down the steps," answered "No."[3]

At the end of Twyman's case the trial judge directed a verdict for Johnson on the negligence count, concluding that Twyman, though she had fallen from steps conceded by Johnson to be defective, had presented no evidence to establish that the condition of the steps caused her fall. The breach of warranty, abuse of process, and retaliation claims were later submitted to the jury, which awarded Twyman damages (in the form of a rent abatement) for the warranty claim and separate damages of $10,000 for retaliation, while rejecting the claim of abuse of process.

## II.

Twyman appeals from the directed verdict on negligence, and also attacks evidentiary rulings which she contends weakened her presentation of the abuse of process claim to the jury. Johnson in turn challenges the trial court's ruling which allowed the retaliation claim to go to the jury both as a defense to the suit for possession and back rent and as an independent claim and counterclaim.

## A.

■■■ We sustain the directed verdict on negligence. Although we view the evidence on appeal in the light most favorable to the party that prevailed in the trial court, *Jackson v. Condor Management Group, Inc.*, 587 A.2d 222, 224 (D.C.1991), a directed verdict is proper when the jury has "no evidentiary foundation on which to predicate intelligent deliberation and reach a reliable verdict." *Papanicolas v. Group Hospitalization, Inc.*,

434 A.2d 403, 404 (D.C.1981). We assume for the sake of argument that Johnson's failure to maintain the steps in accordance with the housing code was *per se* a breach of the duty she owed Twyman as her tenant. *See Ross v. Hartman*, 78 U.S.App.D.C. 217, 218, 139 F.2d 14, 15 (1943). Nevertheless, "[w]hether or not the negligence caused the injury is a separate question.... A simple breach of duty having no causal connection with the injury cannot produce legal responsibility." *Richardson v. Gregory*, 108 U.S.App.D.C. 263, 266, 281 F.2d 626, 629 (1960). A plaintiff must prove both negligence and causation. *Id.; see also H.R.H. Constr. Corp. v. Conroy*, 134 U.S.App.D.C. 7, 9, 411 F.2d 722, 724 (1969). In *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.*, 350 A.2d 751 (D.C.1976), we similarly held that even if the regulations in question (police traffic regulations) applied and had been violated, "they would establish negligence only. Appellants would still bear the burden of showing that the negligence proximately caused the damage." *Id.* at 754. *See also Rong Yao Zhou v. Jennifer Mall Rest.*, 534 A.2d 1268, 1277 (D.C.1987) ("[P]laintiffs must prove that the statutory violation was the proximate cause of their injuries"); *Otis Elevator Co. v. Tuerr*, 616 A.2d 1254, 1259 (D.C.1992) (plaintiff must prove that "injury resulted from the risk against which the statute was designed to protect").[4]

Twyman was required to present evidence sufficient to persuade a reasonable jury by a preponderance of the evidence that "the breach of duty ha[d] a substantial and direct causal link to [her] injury." *Freeman, supra* note 4, 477 A.2d at 716.[5] She failed to do so.

---

3. At one point, Twyman's expert, Harrison, testified without objection that a variation in the width of a tread was "what caused the fall." A short time later, however, the trial judge expressly refused to allow Harrison to render an opinion as to what had caused Twyman's fall because the testimony and exhibits, including Twyman's own testimony, provided no "factual foundation" for that opinion.

4. It therefore is not the law in this jurisdiction that proximate causation is presumptively shown by proof of a safety violation alone when the injury "is generally of the kind intended to be avoided by the law or regulation involved." *Bowman v. Redding & Co.*, 145 U.S.App.D.C.

294, 302, 449 F.2d 956, 964 (1971). While proof of a safety violation may be enough to establish "foreseeability of injury," *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984), it does not, without more, meet the "cause in fact" requirement of proximate causation. *Id.* at 716 & n. 9. On that element, no presumption can relieve the plaintiff of her burden of proof.

5. As we stated in *Freeman:*

[i]n this sense, proximate cause bears a resemblance to cause in fact. This latter element of a prima facie negligence case requires a plaintiff to introduce evidence which affords a reasonable basis for the conclusion that it is more

Since Twyman was the only witness to the accident and she admitted that she did not know what had caused her fall, the jury could not reasonably have decided that she fell, for example, because she stepped on a slippery or uneven stair tread—and *not* simply because she missed a step or lost her balance while not holding the guardrail (she was carrying a bag of trash at the time). In *Rich v. District of Columbia*, 410 A.2d 528 (D.C. 1979), upon which Twyman relies, the plaintiff did not know which depression in the sidewalk had caused her to fall, but she did testify that as she was walking " 'one leg went into a depression and the other foot hit something metal.... I just flew through the air above this hole ... and I landed ... on the ground....' " *Id.* at 533. She was able, therefore, at least to link her accident causally to a defect in the pavement. Similarly, in *Washington v. District of Columbia*, 429 A.2d 1362 (D.C.1981) (en banc), the plaintiff testified that she had reached out for the handrail to steady herself, but fell because no handrail existed (" 'that's when I lost my balance, when I tried to grab for a rail' "). *Id.* at 1368. Unlike in these cases, Twyman gave no testimony tying her fall to a defective condition of the stairs other than her bare statement that she set her foot down on the second or third step and fell.

Twyman also relies on *McCoy v. Quadrangle Dev. Corp.*, 470 A.2d 1256 (D.C.1983), an elevator accident (fatality) case in which we reversed a grant of summary judgment and held there was a triable issue as to causation even though "no one knew with any degree of certainty how decedent got to the bottom of the elevator shaft...." *Id.* at 1259. But we did so partly because "to force appellants in·this case to allege just how and by what means decedent's accident occurred 'would

do violence to the principle of *res ipsa loquitur*,' " *id.* at 1259–60 n. 7 (citation omitted), and partly because the death of the victim meant that "there [were] no eyewitnesses to [the] accident...." *Id.* at 1259. Neither aspect of that reasoning applies here.· Elevator (and escalator) accident cases are perhaps the paradigm application of *res ipsa loquitur*. See, e.g., *Otis Elevator Co. v. Tuerr*, 616 A.2d at 1258; *Otis Elevator Co. v. Henderson*, 514 A.2d 784, 785–86 (D.C.1986); *Bell v. Westinghouse Elec. Corp.*, 483 A.2d 324, 329 (D.C.1984).[6] That principle was neither pled nor presented to the jury in this case, and our holding that Twyman failed to link her fall on the steps to Johnson's negligence does no violence to it. *See Tuerr*, 616 A.2d at 1258 (*res ipsa* applies when, *inter alia*, " '[t]he event [is] of the kind which *ordinarily* does not occur in the absence of someone's negligence' " (citations omitted; emphasis added)). And, of course, Twyman testified and described her accident, but forthrightly could not explain what caused her to fall.

Twyman relies on the testimony in passing of her expert, Harrison, that a defective stair tread was "what caused the fall." But, as the trial judge recognized shortly thereafter, see note 3, *supra*, Harrison had no foundation on which to conclude that this defect actually caused the accident. In refusing to let Harrison render an opinion on causation and in then granting a directed verdict, the judge in effect struck the witness' earlier statement on causation.[7]

"Normally, the existence of proximate cause is a question of fact for the jury." *Freeman*, 477 A.2d at 716. In this case, however, the trial judge correctly discharged his duty to remove the issue from the jury

---

likely than not that the conduct of the defendant was a substantial factor in bringing about the result.
477 A.2d at 716 n. 9 (quoting W. PROSSER, LAW OF TORTS § 41, at 241 (4th ed. 1971)).

6. Even there, however, we have held that "the elements of *res ipsa loquitur* must be established with some precision," and have sustained the grant of a directed verdict in favor of the defendant. *Hailey v. Otis Elevator Co.*, 636 A.2d 426, 429 (D.C.1994).

7. The parties debate whether testimony by Dr. Epps, Johnson's orthopedic expert who was called out of turn during Twyman's case (and who had examined and spoken to Twyman), can fairly be considered in evaluating the sufficiency of Twyman's proof on causation. Assuming that it can, Dr. Epps's wholly unelaborated testimony about Twyman's telling him two years after the accident that she had fallen because "[t]he steps were bad" did not fill the gap created by Twyman's inability in court to explain the *cause of* her accident.

when a finding that defects in the stairs had substantially contributed to the accident would have rested upon surmise.

## B.

■ We deal briefly with Twyman's contention that the trial judge abused his discretion in refusing to permit rebuttal testimony by one proposed witness (Abraham) and in restricting the rebuttal testimony of another (Ingraham). Twyman proffered the testimony, particularly of Abraham, to rebut a denial by Johnson's earlier attorney, Kane, that in a telephone conversation with Abraham (then Twyman's counsel) Kane had threatened that Johnson would raise the rent "and put Ms. Twyman out on the street." The point was important, Twyman asserts, to establish her claim of abuse of process in the form of Johnson's suits for possession filed thereafter.

The trial judge originally barred the testimony because Twyman called Kane as her own witness and then claimed surprise when he denied having made the statement, a claim of surprise the judge rejected. When Johnson later called Kane as a witness on a narrower point, Twyman used cross-examination to elicit a fresh denial of the·threat, then sought again to introduce the disputed rebuttal testimony.

■ A party may not impeach its own witness unless it satisfies the trial court that the witness's testimony was a surprise and affirmatively damaged its case. D.C.Code § 14–102 (1989). *See, e.g., Waldron v. United States,* 613 A.2d 370, 372 (D.C.1992). A trial judge's ruling on whether a party may impeach its own witness will be reversed only if it "is without any rational basis"—"a very deferential standard of abuse of discretion." *Hawkins v. United States,* 606 A.2d 753, 759 (D.C.1992) (citations omitted); *Crain v. Allison,* 443 A.2d 558, 564 (D.C.1982) (same rule in civil case). Twyman·does not contest the judge's refusal to let Abraham testify to rebut Kane's initial testimony (in Twyman's case), but argues that Johnson opened the door to the rebuttal by calling Kane in her own case. The judge rejected this argument,

as do we. It was Twyman's counsel who revisited the matter of the telephone conversation by cross-examining Kane in a manner that strayed beyond the scope of the direct examination. The judge, therefore, could fairly determine that the renewed effort to rebut Kane's denial was designed to circumvent his earlier ruling that Twyman had failed to establish surprise and so could not impeach her witness. In any event, as the judge recognized, the proposed rebuttal testimony by either Abraham or Ingraham added little to the basis Twyman had already laid for her claim that Johnson's institution of suit had been an abuse of process—a claim, we observe, that was weakly founded in the evidence both presented and proffered. *See Bown v. Hamilton,* 601 A.2d 1074, 1080 (D.C. 1992) (pointing to "our cautious approach in defining the scope" of this and related torts involving "a 'perversion of the judicial process' ").

## C.

In the consolidated landlord and tenant action, the jury partially accepted Twyman's claim (both in her amended complaint in the civil action and in her counterclaim in the landlord and tenant suit) of substantial housing code violations, and awarded her a substantial abatement of the rent paid between April 1989 and June 1991, and due since July 1991.[8] Johnson does not challenge the jury's finding of what amounted to a partial breach of the implied warranty of habitability. (Nor does she challenge the later award of attorney's fees to Twyman under the Act.) She does contend, however, that (a) the trial judge erroneously permitted Twyman to assert as an affirmative defense to Johnson's suit for possession the alleged retaliatory nature of the lawsuit; and (b) the judge erroneously allowed Twyman to assert an independent cause of action (both in her amended civil complaint and in her counterclaim to the possessory action) for retaliation based upon D.C.Code § 45–2552 (1990) ("Retaliatory Action")—a claim on which the jury awarded Twyman $10,000 in separate damages.

---

8. *See Javins v. First Nat'l Realty Corp.,* 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970).

Johnson argues strenuously that, "as a matter of law, retaliation is available as an affirmative defense only in a complaint for possession based upon a notice to quit where the landlord seeks to terminate the tenancy," in contrast to "[t]he action below, which was one for non-payment of rent in which Twyman could exercise her equity of redemption pursuant to the 'Trans–Lux' Doctrine (*Trans–Lux Radio City Corp. v. Service Parking Corp.*, 54 A.2d 144 (D.C.1947)." We express no view on this issue, however, because the affirmative defense of retaliation (as distinct from Twyman's separate claim and counterclaim alleging retaliation) had no effect upon the jury's verdict in this case. The verdict form which the jury completed makes clear that its verdict in the landlord and tenant suit rested on partial (but not total) acceptance of Twyman's claim of housing code violations and her consequent entitlement to a rent abatement. In the companion civil action, by contrast, the jury both rejected Twyman's claim of abuse of process and found in her favor on the claim of retaliation, awarding her $10,000. The propriety of the latter verdict (or not) would have no effect on the jury's finding that Johnson partly breached the warranty of habitability and that Twyman was partly justified in withholding rent. We therefore decline to consider Johnson's attack on retaliation as an affirmative defense to suits for non-payment of rent rather than for "possession based upon a notice to quit."

█ Presented for decision, instead, is the issue whether Twyman could properly maintain a separate cause of action for damages under the anti-retaliation statute, D.C.Code § 45–2552. The issue is purely one of statutory construction because, as this court has recognized, that cause of action did not exist at common law. In *Weisman v. Middleton*, 390 A.2d 996 (D.C.1978), the court held that

there is *no authority* in this jurisdiction establishing an independent cause of action by a tenant against a landlord based on an unsuccessful retaliatory eviction suit. The cases reflect the courts' recognition of retaliatory eviction only as a valid defense to a landlord's action for possession....

*Id.* at 1002 (emphasis added). The cases referred to by the court were those originating with *Edwards v. Habib*, 130 U.S.App. D.C. 126, 397 F.2d 687 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). In that case the federal court of appeals reviewed an eponymous decision of this court, 227 A.2d 388 (D.C.1967), in which we rejected a defense of retaliatory eviction, applying the common law rule that a landlord could "'terminate a tenancy at will for any purpose he might desire and the tenant could not question his motives or attack his reasons.'" *Id.* at 390 (quoting *Gabriel v. Borowy*, 324 Mass. 231, 85 N.E.2d 435, 438 (1949)). In reversing that decision, the federal court, motivated partly by "the spur of avoidance of constitutional questions," 130 U.S.App.D.C. at 142, 397 F.2d at 703 (McGowan, J., concurring in part), construed the District's eviction statutes as "inherent[ly]" precluding their own application "where the [trial] court's aid is invoked to effect an eviction in retaliation for reporting housing code violations." *Id.* at 141, 397 F.2d at 702. In a word, "evidence of retaliation" was "[ ]available as a defense to a possessory action brought under [these statutes]." *Id.* at 138, 397 F.2d at 699. *See also Robinson v. Diamond Housing Corp.*, 150 U.S.App.D.C. 17, 20, 463 F.2d 853, 856 (1972) (*Habib* "held that a tenant may assert the retaliatory motivation of his landlord as a defense to an otherwise proper eviction").

The present parties agree that *Habib's* recognition of a *defense* of retaliatory eviction has been codified in statutory enactments in the District of Columbia since 1975.[9] In-

---

9. Codification of the prohibition on retaliatory actions originated in the Reorganization Act, enabling the D.C. Council to pass a rent stabilization program. Pub.L. No. 93–157, § 5, 87 Stat. 626 (1973) (*codified at D.C.Code § 45–1624 (Supp.1974)). Upon this authority, the Council passed the Rental Accommodations Act of 1975, which contained an anti-retaliation provision. D.C.Law 1–33, § 214, 22 D.C.Reg. 2529 (codified

at D.C.Code § 45–1654 (Supp. III 1976)). In 1977, the Council passed the Rental Housing Act, D.C.Law 2–54, § 502, 24 D.C.Reg. 5393 (codified at D.C.Code § 45–1699.7 (Supp.1979)), which was reenacted in 1980, D.C.Law 3–131, § 502, 28 D.C.Reg. 361 (codified at D.C.Code § 45–1562 (1981)), and again in 1985, D.C.Law 6–10, § 502, 32 D.C.Reg. 3089 (codified at D.C.Code § 45–2552 (1990)).

deed, as embodied in the Rental Housing Act of 1985, the bar against retaliation is much more than a simple defense to a housing provider's suit for possession. It is a broad prohibition against

> any retaliatory action against any tenant who exercises any right conferred upon the tenant by this chapter, by any rule or order issued pursuant to this chapter, or by any other provision of law. Retaliatory action may include any action or proceeding not otherwise permitted by law which seeks to recover possession of a rental unit, action which would unlawfully increase rent, decrease services, increase the obligation of a tenant, or constitute undue or unavoidable inconvenience, violate the privacy of the tenant, harass, reduce the quality or quantity of service, any refusal to honor a lease or rental agreement or any provision of a lease or rental agreement, refusal to renew a lease or rental agreement, termination of a tenancy without cause, or any other form of threat or coercion.

D.C.Code § 45–2552(a). The section goes on to require "the trier of fact" to "presume retaliatory action" in six enumerated instances, and to "enter judgment in the tenant's favor unless the housing provider comes forward with clear and convincing evidence to rebut this presumption." *Id.* § 2552(b); *see De Szunyogh v. William C. Smith & Co.,* 604 A.2d 1, 3–4 (D.C.1992). Enforcing the prohibition is an array of penalties (including civil fines) which may be imposed for conduct found to constitute retaliatory action. D.C.Code § 45–2591. Additionally, the District's Rent Administrator, either on his own initiative or upon a tenant petition claiming retaliation, *id.* § 45–2514(h)(1); 14 DCMR

§ 4303.4 (1991), may investigate the conduct (employing the statutory presumption where applicable) and, if he finds retaliation, "may order the housing provider, in addition to any other penalty prescribed by law, to cease and desist from taking such action, under such terms and conditions as the Rent Administrator may prescribe." 14 DCMR § 4303.6.

Against this remedial background, Twyman argues—and the trial judge implicitly agreed—that § 45–2552(a) goes even further and creates a cause of action for civil damages not heretofore recognized in this jurisdiction. *Weisman, supra.*[10] We hold that it does not. "The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction," *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979), one which requires a court to "begin with the language of the statute itself." *Id.* at 16, 100 S.Ct. at 245. Section 45–2552 does not expressly create an action for damages. It differs in this regard from, for example, § 45–2591(c) (part of the same Act), which allows a housing provider who has provided relocation assistance to "bring a civil action to recover the amount of relocation assistance paid to any person who was not eligible to receive the assistance."[11] Section 45–2552(b) does refer to "ent[ry of] judgment in the tenant's favor," but this is consistent with *Habib* 's recognition of a defense of retaliatory eviction, and not inconsistent with the "finding of retaliation," 14 DCMR § 4303.6, sufficient to allow the Rent Administrator to order quasi-injunctive relief.[12]

The legislature's intent also "may appear implicitly in the language or structure of the

---

**10.** By "heretofore" we mean prior to statutory enactment of an anti-retaliation provision in 1975. We note that, although *Weisman* was decided in 1978, trial in that case apparently took place before enactment of the Rental Accommodations Act of 1975. In any event, the court never adverted to the 1975 statute, and it would be unreasonable to read the decision as having impliedly resolved the statutory issue presented here.

**11.** *Cf. also* D.C.Code § 1–2556 (1992) ("Any person claiming to be aggrieved by an unlawful discriminatory practice [under the D.C. Human

Rights Act, and including coercion or retaliation, § 1–2525] shall have a cause of action in any court of competent jurisdiction for damages....").

**12.** Similarly, the statutory reference to "the trier of fact" may be to the judge or jury in a suit for possession, the Rent Administrator in a complaint proceeding alleging retaliation, or even a hearing examiner considering imposition of civil sanctions for violation of provisions of the Rental Housing Act. *See* D.C.Code §§ 45–2591(f) (1990), 6–2713(e) (1989).

statute, or in the circumstances of its enactment." *Transamerica Mortgage Advisors,* 444 U.S. at 18, 100 S.Ct. at 246. *See generally Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). However, "unless this [legislative] intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981); *see Kelly v. Parents United for the District of Columbia Public Schools,* 641 A.2d 159, 164 (D.C.1994). The Rental Housing Act confers an entitlement to damages on tenants, but it does so in highly restricted fashion. Only the Rent Administrator and Rental Housing Commission are expressly authorized to award damages, and then only for two forms of conduct—albeit important ones—among the many that may constitute retaliatory action: unlawful rent increases and unlawful reduction or elimination of services. D.C.Code § 45–2591(a) (permitting treble rent refund and/or roll back). We think it improbable that the legislature, having provided thus specifically for damages, meant also to create a cause of action in court for civil damages without expressly having said so. *Karahalios v. National Fed'n of Fed. Employees Local 1263,* 489 U.S. 527, 533, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989) (if a statute provides one sort of remedy, "courts must be especially reluctant to provide additional remedies"); *Fountain v. Kelly,* 630 A.2d 684, 690 (D.C. 1993). *See also Walker v. Gregory,* 108 Daily Wash.L.Rptr. 65, 72 (D.C.Super.Ct. Jan. 11, 1980) (Bowers, J.) (in enacting predecessor Rental Housing Accommodations Act of 1975, the legislature "considered civil damages provisions but extended that remedy only to the recovery of treble damages by tenants who have been overcharged or who have had services reduced").

The legislative history of the Rental Housing Act contains no discussion of § 45–2552. The committee report underlying the Rental Accommodations Act of 1975 states only that "[t]he retaliatory action section is an integral part of any rent stabilization program," and that by providing for "civil remedies in addition to criminal [now civil infraction] sanctions," the Council meant to encourage "tenants to pursue their rights under the act." [13] This, of course, leaves unanswered exactly what those rights are. Twyman cites nothing in the statute or in the legislative history to support her argument, but relies instead on what this court has recognized to be the remedial purpose of the Rental Housing Act generally. *See, e.g., Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1299 (D.C.1990). Construing the Act to preclude a suit for damages, she says, would leave a tenant without remedy for retaliation by a landlord who refrains from bringing legal action.[14] We disagree.

Administratively, a tenant is not left uncompensated when the landlord commits either of the core prohibited acts (unlawfully raising rent or reducing services) for which the Rent Administrator may award a rent refund or roll back. § 45–2591(a). Indeed, a factor the Administrator would likely consider in determining whether to *treble* the refund is the presence of a retaliatory animus. *See* 14 DCMR § 4217.2 ("bad faith"). Furthermore, the tenant remains free, as in this case, to sue for damages for breach of the warranty of habitability based on actions (or inaction) which the landlord may have taken punitively. *See* note 1, *supra.* And still additional remedies are those already discussed—defensive use of claimed retaliation, administrative quasi-injunctive relief, and civil infraction penalties. Twyman's argument at bottom is that, having preserved or created all of these remedies, the legislature must be assumed to have intended others, a proposition contrary to the normal rule for reading statutes. *See Karahalios, supra; Fountain, supra; cf. Suter v. Artist M.,* 503 U.S. 347, 357–59, 112 S.Ct. 1360, 1368–69, 118 L.Ed.2d 1 (1992).

■ We therefore reject Twyman's reliance on maxims such as "where there is a

---

13. HOUSING AND URBAN DEVELOPMENT COMM. OF THE DISTRICT OF COLUMBIA, RENTAL HOUSING ACCOMMODATIONS ACT OF 1975, REPORT ON BILL 1–157 at 37 (July 31, 1975).

14. Twyman is not happily situated to make this claim since the retaliation she alleged was the filing of two unjustified suits for possession and back rent.

right there is a remedy," *see Alabama Power Co. v. Ickes,* 302 U.S. 464, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374 (1938), and the rule that remedial statutes should be construed generously to achieve their purposes. *Goodman,* 573 A.2d at 1299. Section 45–2552 is part of an elaborate remedial scheme in the District of Columbia governing landlord and tenant relations. Finding a civil cause of action for damages implicit in the statute is unnecessary to effectuate its remedial purpose. And another rule of construction makes us particularly reluctant to do so. As *Weisman, supra,* confirms, there is no common law authority for a cause of action for retaliation against a landlord. *Habib, supra,* in construing the then-statutory scheme to provide a defense of retaliatory eviction, did not change that rule. We accordingly must read § 45–2552 mindful of the canon that statutes in derogation of the common law are strictly construed, a rule creating "a rebuttable presumption," *Monroe v. Foreman,* 540 A.2d 736, 739 (D.C.1988), that the legislature has not intended " 'any innovation upon the common law which it [has] not fairly express[ed].' " *Dell v. Department of Employment Servs.,* 499 A.2d 102, 107 (D.C.1985) (quoting *Shaw v. Railroad Co.,* 101 U.S. 557, 565, 25 L.Ed. 892 (1879)). While this canon may not " 'defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure,' " *Monroe,* 540 A.2d at 739 (quoting *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930)), our analysis has found no such purpose or intent in § 45–2552 to create the remedy Twyman seeks.

We hold that Twyman had no independent cause of action for damages for Johnson's alleged retaliation, and that the judge erred in submitting that count of the amended complaint and the counterclaim to the jury. We therefore reverse the judgment awarding Twyman $10,000 for retaliation and remand with directions to dismiss that count. We affirm the judgment directing a verdict for Johnson on the count of negligence.

*So ordered.*