Oliver A. COWAN, et al., Appellants

v.

Farouk YOUSSEF, et al., Appellees.

Farouk YOUSSEF, et al., Appellants

v.

Oliver A. COWAN, et al., Appellees.

Nos. 93–CV–1637, 94–CV–2, 94–CV–318.

District of Columbia Court of Appeals.

Argued April 18, 1995.

Decided Dec. 30, 1996.

---

Richard W. Luchs, with whom Roderic L. Woodson was on the brief, Washington, DC, for Oliver A. Cowan, et al. (landlords).

Steven M. Schneebaum, with whom Robert K. Taylor was on the brief, Washington, DC, for Farouk Youssef, et al. (tenants).

Before TERRY, KING, and RUIZ, Associate Judges.

TERRY, Associate Judge.

Before us are three consolidated appeals arising out of a protracted landlord-tenant dispute. The Rittenhouse Limited Partnership (RLP) owns the Rittenhouse Apartments on Sixteenth Street, N.W., which is managed by United Management Company. Oliver A. Cowan is the general partner in RLP. Nineteen residents of various apartments within the building (collectively "the tenants") filed this suit against Cowan, RLP, and United Management (collectively "the landlords"),[1] stating several claims related to what is known as a "Seventy Percent Voluntary Agreement." The second amended complaint, which eventually went to trial, contained four counts alleging breach of contract, breach of implied warranty of habitability, negligence, and fraud. Only the first two counts went to the jury, which returned a verdict for the tenants on the first count and for the landlords on the second.

On appeal, the landlords challenge the trial court's denial of their motion for directed verdict on the tenants' claim of breach of contract, as well as the court's imposition of a monetary sanction against Mr. Cowan for failure to comply with certain of the tenants' discovery requests. The tenants contend that the court erred in denying their pre-trial motion for class certification, in instructing the jury on the calculation of damages for breach of contract, and in directing a verdict in favor of the landlords on the fraud claim. Additionally, the tenants maintain that the jury's verdict against them on the count alleging breach of the implied warranty of habitability was contrary to the evidence. We reject both the landlords' and the tenants' claims of error and affirm the judgment.

## I. The Facts

In 1986 the landlords and the tenants entered into a "Seventy Percent Voluntary Agreement"[2] which provided that the landlords would replace the Rittenhouse's central heating and cooling system with individual units in each apartment. Up to that time, the landlords had paid all costs associated with climate control and hot water in the building. Once this system was installed, however, the tenants agreed to assume the utility costs for the heating and cooling of their individual apartments. In addition, the landlords promised: (1) that the new individual units would operate quietly, efficiently, and effectively upon installation; (2) that the kitchen and bathroom vents in each apartment would be in proper operating condition; and (3) that the windows surrounding the heating and cooling units would be properly adjusted and caulked to prevent drafts and leaking. As a further enticement to the tenants, the landlords also agreed to renovate the building's elevators, to install a gymnasium and exercise room, and to construct a

---

1. Two limited partners were also named as defendants, but they were dismissed from the case by stipulation before trial.

2. Under D.C.Code § 45–2525(a) (1996), seventy percent or more of the tenants in a particular building may enter into a voluntary agreement with the landlord:

> (1) To establish the rent ceiling;
> (2) To alter levels of related services and facilities; and
> (3) To provide for capital improvements and the elimination of deferred maintenance (ordinary repair).

large water fountain in the front courtyard of the building. After the approval of this agreement by seventy percent of the tenants, the landlords began the conversion of the heating and cooling system in August 1987.

Between 1988 and 1990, several tenants of the Rittenhouse who had initially objected to the agreement unsuccessfully pursued various administrative remedies to prevent it from being carried out. Those remedies were exhausted, however, when this court rejected all the tenants' challenges to the Voluntary Agreement in *Davenport v. District of Columbia Rental Housing Commission*, 579 A.2d 1155 (D.C.1990). Dissatisfied with the now-completed conversion process, the tenants filed this suit on July 31, 1991. Exactly a year later, on July 31, 1992, the tenants filed a motion for class certification of all persons who lived at the Rittenhouse during the three years immediately preceding the filing of the complaint. The landlords opposed the motion for class certification, and the court denied it without a hearing (none was requested).

In due course the case came to trial before a jury. Four issues were litigated: (1) whether the landlords had installed substandard climate control units in the building, in violation of the Voluntary Agreement; (2) whether the landlords had negligently installed these units; (3) whether the installation of these units violated the warranty of habitability implied in the tenants' leases; and (4) whether the landlords had committed fraud in performing the Voluntary Agreement.

The tenants presented extensive testimony that the heating and cooling units installed in their apartments failed to comply with the terms of the Voluntary Agreement. In sum, the tenants' evidence showed that the units lacked sufficient power to heat or cool all the rooms, were noisy, and lacked automatic temperature settings; that their installation left spaces around the units in many apartments where cold air and water leaked in from the outside; that the promised ventilation of the kitchens and bathrooms was virtually non-existent; and that the regulation of the hot water temperature throughout the building was erratic and generally unsatisfactory. The tenants also testified that the

additional promises made by the landlords regarding the planned exercise room and the fountain were never fulfilled. The allegations concerning the heating and cooling units were supported by the testimony of two experts, who said that the units in the Rittenhouse were substandard models, that they had been negligently installed, and that they had insufficient power to regulate effectively the temperature inside the apartments.

In response, the landlords offered testimony to the effect that the requirements of the Voluntary Agreement were satisfactorily performed in good faith, that the heating and cooling units were appropriate for the apartments, and that they were properly installed. The landlords also asserted that any problems resulting from the installation of the units which were communicated to the Rittenhouse management and staff were promptly, and consistently, investigated and corrected. An expert witness testified that the units installed in the Rittenhouse were of better quality in design, energy efficiency, and heating capability than other units on the market. This expert also said that the units operated at a low decibel level.

During trial, it became apparent that Mr. Cowan had not fully complied with previous requests for production of documents made by the tenants during pre-trial discovery. Consequently, the court imposed a monetary sanction against Cowan in the amount of $10,000. The next day, however, the court *sua sponte* reduced this amount to $6,000, stating that the earlier sanction was "excessive."

After the close of all the evidence, the court dismissed two counts of the complaint: Count III, alleging the negligent installation of the heating and cooling units, and Count IV, alleging fraud in the performance of the Voluntary Agreement. The case went to the jury on the two remaining counts. The jury found in favor of the tenants on Count I of the complaint, which alleged breach of the express terms of the Voluntary Agreement, and awarded them a partial rent abatement amounting to approximately $80,000. The jury found in favor of the landlords on Count II, which alleged breach of the implied warranty of habitability.

When the verdict was reduced to judgment a few days later, the court failed to incorporate into the judgment its earlier decision to impose a $6,000 sanction on Mr. Cowan for his discovery violations. The tenants filed a timely motion under Super. Ct. Civ. R. 60(a) to amend the judgment by correcting this omission. The landlords then filed a notice of appeal from the judgment (No. 93–CV–1637), and the tenants noted a cross-appeal (No. 94–CV–2). About ten days later, the court entered an order granting the tenants' motion to amend the judgment. Cowan then filed a motion for reconsideration of that ruling, which the court denied in a two-page order; Cowan filed a notice of appeal (No. 94–CV–318) from that denial. This court later consolidated all three appeals.

## II. THE LANDLORDS' CLAIMS OF ERROR

### A. The Denial of the Motion for Directed Verdict

In their motion for a directed verdict on the breach of contract claim, the landlords argued that the tenants had failed to produce any evidence of economic loss suffered as a result of the alleged breach of the Voluntary Agreement. Initially, the court granted the landlords' motion, but after reconsideration the court decided to allow this claim to go to the jury. The court ruled that a reasonable jury, given the amount of rent paid by each individual tenant plaintiff (which the tenants had proved in the course of the trial), could use those amounts as a basis for calculating damages if it found the landlords liable.

■ On appeal, the landlords contend that the trial court erred in denying their motion for a directed verdict on the breach of contract claim. They make two arguments: (1) that the Voluntary Agreement was a contract separate from the tenants' leases, and therefore that an abatement of the rent, the amount of which was stated in those leases, could not properly be awarded as damages for any breach of the agreement; and (2) that, in any event, there was no evidence that the breach resulted in any economic loss to the tenants. We review a ruling on a motion for directed verdict in the light most favorable to the prevailing party. *E.g., District of Columbia v. Cassidy,* 465 A.2d 395, 397 (D.C.

1983). Applying that standard, we affirm the trial court's ruling.

### 1. The Nature of the Voluntary Agreement

The Rental Housing Act was enacted, in part, to protect tenants in the District of Columbia from potential economic abuses by their landlords, while at the same time enabling landlords to obtain a reasonable return on their investments. *See* D.C.Code § 45–2502 (1996). Relevant to the present case is section 45–2525(a) of the Act, quoted in part in note 2, *supra*, which authorizes landlords and tenants to enter into Voluntary Agreements of the sort at issue here. The Act further provides that, "[i]f approved by the Rent Administrator, [a voluntary] agreement shall be binding on the [landlord] and on all tenants." D.C.Code § 45–2525(b).

■ In this jurisdiction, leases of residential units are interpreted under general provisions of contract law rather than property law. *See Javins v. First National Realty Corp.,* 138 U.S.App. D.C. 369, 373–375, 428 F.2d 1071, 1075–1077, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). "Contract principles established in other areas of the law provide a more rational framework for the apportionment of landlord-tenant responsibilities...." *Id.* at 378, 428 F.2d at 1080. Thus it is beyond dispute that the leases between the landlords and the tenants in this case are to be treated as contracts, and that the rights of the parties are contractual rights. What we must decide here is whether the Voluntary Agreement had any effect on those rights, so that a remedy for a breach of the Voluntary Agreement may be devised by looking to the lease.

We know of no case exactly like this one, but a close analogy may be found in *Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359 (D.C.1984). In that case a prospective purchaser of a house agreed, in the contract of sale, to rent the house for three months before actually buying it. A separate lease was drawn up for a three-month term, and the purchaser moved into the house. After two of the purchaser's checks bounced, however, the homeowners filed suit for possession, and the tenant/purchaser moved out

soon thereafter. The homeowners then sued the two real estate agencies which had brokered the deal for breach of their fiduciary duties. Addressing the issue of damages, this court held that the sale contract and the three-month lease together constituted a single contract because each referred to specific provisions within the other. "When a written agreement incorporates a second writing, the two documents must be read together as constituting the contract between the parties.... We must also read the two documents in a manner that gives a reasonable, lawful, and effective meaning to all their terms." *Id.* at 366 (citations omitted). We therefore held that a liquidated damages clause in the sale contract limited the damages available under the lease as well, which had no comparable provision.

Although a Voluntary Agreement is a creature of statute and requires administrative approval before it may take effect, it is also a modification of an existing lease. In the case at bar, for example, the tenants' original leases provided for central heating and air conditioning, paid for by the Rittenhouse management. The Voluntary Agreement modified this lease provision by making the tenants themselves responsible for the costs of heating and cooling their apartments. Thus the two agreements must be read together as one because the second altered the mutual obligations of the parties as set forth in the first, and the second cannot be properly understood without reference to the first. The landlords' assertion that the Voluntary Agreement "has an existence separate and apart from the leasehold relationship" denies the very nature of a Voluntary Agreement as an alteration of the rights and duties of landlord and tenant under the lease. *See* D.C.Code § 45–2525.

■ We hold, therefore, that Voluntary Agreements are not contracts separate from leases. Rather, once approved by the Rent Administrator, a Voluntary Agreement becomes an integral part of the now-modified lease, and the courts must read the two agreements together "in a manner that gives

a reasonable, lawful, and effective meaning to all their terms." *Laufer, supra,* 482 A.2d at 366; *cf. North Lincoln Park Neighborhood Ass'n v. Alcoholic Beverage Control Board,* 666 A.2d 63, 66–67 (D.C.1995) (voluntary agreement which settled prior license renewal dispute became part of license, and breach of that agreement must be taken into account in future license renewal proceedings). Since a rent abatement is an accepted form of damages imposed upon a landlord for violating the terms of a lease,[3] we further hold that a rent abatement may also be awarded as damages for breach of a Voluntary Agreement.

### 2. *Damages*

■ The landlords do not seriously contend, nor could they, that there was no evidence of a breach of the Voluntary Agreement. The tenants and two expert witnesses testified in some detail that, contrary to the express terms of the Voluntary Agreement, the new heating and cooling units lacked sufficient power to heat or cool apartment rooms, were noisy, and had no automatic temperature controls. There was also evidence that the installation of many of these units left spaces around the edges where cold air and water leaked in from the outside. In addition, the tenants testified that the additional promises made by the landlords in the Voluntary Agreement (installation of an exercise room, the fountain in the courtyard, etc.) were never carried out. The landlords argue instead that the tenants failed to prove that they suffered any cognizable economic damage, since the Voluntary Agreement also provided for a three-year rent freeze and a minimal rent increase for two years thereafter, and those terms were fulfilled.

■ It is settled law that a plaintiff in a civil action is not required to prove the exact amount of damages, but need only provide "some reasonable basis on which to estimate damages." *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982); *see Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 205 (D.C. 1986). If such a reasonable basis is shown,

3. *See Bernstein v. Fernandez,* 649 A.2d 1064, 1072 (D.C.1991); *Novak v. Cox,* 538 A.2d 747, 751 (D.C.1988).

this court will not disturb a jury's award of damages. *Columbus Properties, Inc. v. O'Connell,* 644 A.2d 444, 447 (D.C.1994). This court has also held that the value of an apartment in good repair may be established by proof of the amount of the monthly rent. *Bernstein v. Fernandez, supra* note 3, 649 A.2d at 1072. Consequently, evidence that an apartment is not in good repair—*e.g.,* that its heating and cooling system does not work properly—is sufficient to allow a jury to find a decrease in the value of that apartment, which would provide a basis for assessing damages. *See Hsu v. Thomas,* 387 A.2d 588, 589 (D.C.1978); *Javins v. First National Realty Corp., supra,* 138 U.S.App. D.C. at 378, 428 F.2d at 1080.

In the instant case, several tenants and two experts testified to a variety of deficiencies in a number of apartments in the Rittenhouse in violation of the Voluntary Agreement, and documentary proof of the tenants' rents under the lease was introduced as evidence of the value of their apartments when in good repair. This combination of evidence, we hold, was sufficient to permit the jury to determine the proper amount of damages under the court's instructions, in which we can discern no error.

■ The landlords maintain nevertheless that our recent opinion in *Twyman v. Johnson,* 655 A.2d 850 (D.C.1995), supports their contention that claims for damages under Voluntary Agreements approved by the Rental Housing Commission may be awarded only in the limited context of an administrative proceeding before that agency. We hold that *Twyman* is inapposite.

In *Twyman* we had to decide whether the Rental Housing Act's anti-retaliation section, D.C.Code § 45–2552, which prohibits "any retaliatory action against any tenant who exercises any right conferred upon the tenant by [the Rental Housing Act], or by any other provision of law," created for tenants an affirmative cause of action for civil damages in addition to a defense against an action for possession. We held that it did not, concluding that the language of section 45–2552 conferred on tenants an entitlement to damages only through an administrative proceeding before the Rental Housing Commission. *Id.*

at 856–858. In the case at bar, however, the tenants' cause of action is rooted in common law. Unlike the tenant in *Twyman,* who argued that she had a statutorily based cause of action (because she had no common law claim, *id.* at 855), the tenants in this case alleged and proved that the landlords had breached their lease, as modified by the Voluntary Agreement, by failing to provide various promised and paid-for services. As we stated earlier, the Voluntary Agreement was itself a contract, and upon its ratification by the Rental Housing Commission, it became a modification of their original lease—another contract. Thus, upon the breach of the Voluntary Agreement, the tenants could properly seek common law damages by bringing an action for breach of contract, which is exactly what they did. The landlords' reliance on *Twyman* is misplaced.

### B. The Imposition of Discovery Sanctions

■ During the period of pre-trial discovery, Mr. Cowan was requested to produce copies of all maintenance logs and service contracts for the Rittenhouse covering the years from 1986 through 1989. In response, he turned over a large number of records, and thereafter, through counsel, he assured the tenants that all extant maintenance documents had been produced. At trial, however, testimony from a maintenance worker employed by the Rittenhouse, as well as from Mr. Cowan himself, revealed that several maintenance records and service contracts in fact had not been provided. In response to a request from the tenants' counsel, the trial court directed Cowan to turn over any relevant documents that had been requested but not yet delivered.

The next day, after the remaining documents had been produced, the court levied a monetary sanction against Cowan in the amount of $10,000, ruling that Cowan's "willful" and "reckless" failure to comply with the discovery request had hindered the development and preparation of the tenants' case. On the following day, however, the court *sua sponte* lowered this sanction to $6,000, stating that the amount originally imposed had been "excessive." On appeal, Cowan contends that the imposition of any monetary

sanction for his violation of the tenants' discovery request was error. In essence, Cowan argues (1) that the documents he did turn over during discovery were of the same character as the documents he failed to produce until trial; (2) that none of these documents were used by the tenants in their case in chief; and (3) that the trial court failed to give an adequate explanation for both the initial sanction and the later reduction of the amount.

■■■ The tenants contend that Cowan failed to file a timely notice of appeal challenging the court's imposition of the discovery sanction. The order granting the tenants' Rule 60(a) motion to correct the judgment was docketed on January 21, 1994. Cowan had thirty days from that date within which to note an appeal,[4] but instead he chose to file a "motion for reconsideration" on January 31. That motion was denied on February 18, and from that denial he noted an appeal on March 18. Because the motion for reconsideration does not state the rule on which it is based—indeed, it cites no rule at all—the tenants argue that Cowan's time for noting an appeal expired thirty days after January 21, and that the notice of appeal filed on March 18 was therefore untimely.

This court has repeatedly held that the denial of a motion for reconsideration is not an appealable order and that, absent specific authority, such a motion does not toll the time for noting an appeal. *See Taylor v. United States,* 603 A.2d 451, 458–459 (D.C.) (citing cases), *cert. denied,* 506 U.S. 852, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992). Thus the tenants maintain that the notice of appeal was filed too late, and that this court lacks

jurisdiction to entertain Cowan's second appeal. We are satisfied, however, that we do have jurisdiction.

Because the amount of the discovery sanction was not set forth in any judgment or order until January 21, it was the January 21 order that was final and appealable, at least as to that sanction. *See Dyer v. William S. Bergman & Associates,* 635 A.2d 1285, 1287–1288 (D.C.1993); *Trilon Plaza Co. v. Allstate Leasing Corp.,* 399 A.2d 34, 36 (D.C.1979). Cowan's motion for reconsideration was filed on January 31, ten days after the January 21 order, and thus it was timely under Super. Ct. Civ. R. 59(e). The motion asserted that the tenants had not made a sufficient showing of prejudice to justify a sanction, and also argued that the court had not adequately explained its reasons for imposing the sanction and had thereby abused its discretion. We therefore treat Cowan's motion as a motion under Rule 59(e) to alter or amend the January 21 order, even though the motion does not cite Rule 59(e) or, indeed, any rule at all. *See In re Tyree,* 493 A.2d 314, 317 n. 5 (D.C.1985); *Wallace v. Warehouse Employees Union Local 730,* 482 A.2d 801, 804 (D.C.1984) ("The nature of a motion is determined by the relief sought, not by its label or caption").[5] Because it was timely, it "terminated" the time for filing a notice of appeal.[6] When the motion was denied on February 18, the full time for noting an appeal—thirty days—began to run again. *See* D.C. Ct.App. R. 4(a)(2). Cowan's second notice of appeal was timely filed on March 18, twenty-eight days after February 18. We conclude, therefore, that we have jurisdiction to consider Cowan's second appeal and accordingly turn

---

4. This court's Rule 4(a)(1) states that a notice of appeal must be filed "within thirty days after entry of the judgment or order from which the appeal is taken," and Rule 4(a)(3) provides that a judgment or order "is deemed to be entered when it is entered on the civil docket...."

5. The difference between a Rule 59(e) motion to alter or amend a judgment and a Rule 60(b) motion for relief from judgment is often subtle and elusive. We have said that if the motion presents new facts and circumstances, it is properly considered under Rule 60(b); if it claims only an error of law, it is more appropriately regarded as a Rule 59(e) motion. *See Wallace,*

*supra,* 482 A.2d at 804 (citing cases). Cowan's motion in the instant case fits more comfortably within Rule 59(e), for it offers no new facts but merely asserts legal errors.

6. D.C.Ct.App.R. 4(a)(2) provides in part:

The running of the time for filing a notice of appeal is terminated as to all parties by the timely filing, pursuant to the rules of the Superior Court, of [a motion] ... to vacate, alter, or amend the judgment.... The full time for filing a notice of appeal fixed by this section (a) shall begin to run from the entry on the Superior Court docket of an order fully disposing of any of the foregoing motions....

to the merits of that appeal, which challenges only the discovery sanctions.

■ A party's non-compliance with a pre-trial discovery request allows the trial court, in its discretion, to impose a variety of sanctions under Super. Ct. Civ. R. 37(b)(2) and (d). *See Perry v. Sera,* 623 A.2d 1210, 1217 (D.C.1993); *Lyons v. Jordan,* 524 A.2d 1199, 1201 (D.C.1987); *Braxton v. Howard University,* 472 A.2d 1363, 1365 (D.C.1984). When reviewing the imposition of such sanctions, this court will reverse only if the trial court has abused its discretion by "imposing a penalty too strict or unnecessary under the circumstances." *Dodson v. Evans,* 204 A.2d 338, 341 (D.C.1964) (citation omitted). We can find no such abuse in this case. The court carefully explained its reasons for imposing the sanction and found, in addition, that Cowan's non-compliance was willful, a fact that weighs heavily in the tenants' favor. *See Braxton, supra,* 472 A.2d at 1365 & n. 3. In its order denying the motion for reconsideration, the court said that Cowan had "offered no acceptable excuse for failure to comply with the [tenants'] legitimate discovery request" and reiterated its finding of willfulness. Rejecting Cowan's argument that the tenants had failed to show prejudice, the court said:

> [Cowan's] argument that the [tenants] showed no prejudice has no merit inasmuch as the mid-trial production of the voluminous documents requested made it impossible for [the tenants] to show prejudice. To have shown prejudice, [the tenants] would have had to undertake mid-trial examination of the documents, an exercise that would have unduly disrupted the trial.

The record amply supports this ruling and the court's imposition of a sanction. We find no abuse of discretion and hence no ground for reversal.

## III. THE TENANTS' CLAIMS OF ERROR

### A. *The Denial of Class Certification*

■ Before trial, the tenants sought class certification of all persons who lived in the Rittenhouse between July 31, 1988, and July 31, 1991. Upon certification, the tenants planned to assert their claim for breach of the implied warranty of habitability (Count III of the complaint) on behalf of the entire class. Additionally, the tenants asked the court to certify as a subclass all tenants residing at the Rittenhouse when the Voluntary Agreement was approved in 1987. If certified, the subclass would have asserted all four of the claims set forth in the complaint.

■ When seeking class certification, a plaintiff must meet each of the four requirements of Super. Ct. Civ. R. 23(a).[7] Moreover, since the tenants in this case sought certification under Rule 23(b)(3), they were required by that rule to demonstrate, first, that the questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members," and second, that a class action would be "superior to other available methods for adjudication of the controversy." The party seeking certification has the burden of showing that the request for class certification complies with the requirements of the rule. Whether that burden has been met is a matter entrusted to the trial court's discretion, and its decision will not be reversed unless that discretion has been abused. *Yarmolinsky v. Perpetual American Federal Savings & Loan Ass'n,* 451 A.2d 92, 94 (D.C.1982). Indeed, when the trial court conducts a thorough review of the request for class certification, as it did here, we will not reverse its decision even if we would have ruled differently. *McCarthy v. Kleindienst,* 239 U.S.App. D.C. 247, 251, 741 F.2d 1406, 1410 (1984).[8]

The trial court agreed initially that the tenants had made a sufficient showing under Rule 23(a). Turning to the requirements of

7. Rule 23(a) provides:
   One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

8. We are not saying, of course, that we would have ruled differently in this case.

Rule 23(b)(3), however, the court ruled that the issues in the case did not present questions of fact common to all members of the proposed class because "applications of the law in all of the counts will turn largely on individual factual determinations concerning the individual heating and air-conditioning systems in each apartment." The court noted that questions regarding the effectiveness and efficiency of the units in each apartment were likely to depend on the individual needs and desires of each tenant. For the same reasons, the court found that the tenants had failed to establish that a class action would be superior to other methods of deciding the case.[9]

On appeal, the tenants have offered no argument sufficient to refute the trial court's conclusion that neither requirement of Rule 23(b)(3) was met. In fact, the trial testimony of the nineteen tenant plaintiffs confirmed the court's prediction that the heating and cooling units presented problems specific to each apartment. For example, some tenants testified that the new units failed to heat or cool their apartments, or were noisy, and had no automatic temperature settings. Others testified that the installation of the units left spaces around the edges where cold air and water leaked in from the outside. Still others testified that the ventilation of the kitchens and bathrooms, promised in the Voluntary Agreement as an additional modification to the building, was inadequate or even nonexistent. Given this record, and given the tenants' failure even on appeal to show that the requirements of Rule 23(b)(3) were met, we hold that the trial court did not abuse its discretion in denying the motion for class certification.

### B. *The Directed Verdict on the Fraud Claim*

At the close of all the evidence, the trial court directed a verdict for the landlords on Count IV of the tenants' complaint, alleging "fraud in the performance" of the Voluntary Agreement.[10] The court expressed some doubt about whether such a cause of action, sounding in tort,[11] was even recognized in the District of Columbia. *See United States ex rel. DMI, Inc. v. Darwin Construction Co.,* 750 F.Supp. 536, 541 (D.D.C. 1990). But even assuming that such a claim was viable, the court ruled, *inter alia,* that the tenants had presented no evidence of the landlords' specific intent to defraud them, nor had they proved their reliance on any of the landlords' allegedly fraudulent assertions.

The tenants contend that this ruling was erroneous because they presented evidence that the landlords' non-performance of the Voluntary Agreement was deliberate and motivated by a desire to enhance their financial status at the expense of the Rittenhouse tenants. Even assuming the correctness of their description of the evidence, that is not enough to prove fraud. Although there was plenty of evidence that the landlords had breached the Voluntary Agreement, there was none showing that this breach was motivated by a specific fraudulent intent. Fraud "must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit." *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). The evidence at trial, even when viewed in the light most favorable to the tenants, did not pass this test. The tenants offered testimony that the heating and cooling units were among the cheapest on the market, that they were improperly installed and were never maintained according to the manufacturer's specifications, and that the landlords realized an immediate saving of almost $250,000 a year after they were in-

---

9. In addition, the court concluded that, unlike similar cases in which tenants seeking class certification were residents of low-income housing, the tenants in this case had made no showing that they lacked the economic resources to bring individual actions.

10. A claim of fraud in the inducement of the Voluntary Agreement had previously been litigated and resolved in the landlords' favor.

11. It appears that the tenants, by basing this claim on a tort theory, were hoping to obtain an award of punitive damages, which are not available in an action for breach of contract. *See Bernstein v. Fernandez, supra* note 3, 649 A.2d at 1073 (citing cases).

stalled (which was, after all, one of the main purposes of the conversion to individual units). But simply being a cheapskate is not fraud. This evidence showed, at most, that the landlords were penny-pinchers who did not want to spend as much money on the new units as the tenants might have preferred. No reasonable trier of fact could have found by clear and convincing evidence, as *Bennett* and other cases require, that these actions reflected an intent on the part of the landlords to defraud the tenants. Permitting the jury to consider the tenants' fraud claim on these facts would have been an invitation "to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Shelton v. United States,* 505 A.2d 767, 771 (D.C.1986). We hold that the fraud claim was properly taken from the jury.

### C. *The Court's Instructions on Damages*

When instructing the jury on the calculation of damages for breach of the Voluntary Agreement, the trial court said that the jury should quantify the damages award as a percentage of the rent paid by each tenant. The tenants also assert that the court gave the jury an erroneous and highly prejudicial special verdict form. Instead of providing a blank space followed by a percentage sign, the verdict form allegedly contained instead a blank space preceded by a dollar sign (*i.e.,* "$___" rather than "___%"). This error, the tenants maintain, confused the jury and ultimately led to an award of damages inconsistent with the trial court's instructions.

Initially, we note that the verdict form is not in the record, a fact which would normally prompt us to reject the tenants' argument out of hand. "[I]t is appellant's duty to present this court with a record sufficient to show affirmatively that error occurred." *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) (citations omitted). "[W]e cannot base our review of errors upon statements of counsel which are unsupported by [the] record." *D.C. Transit System, Inc. v. Milton,* 250 A.2d 549, 550 (citations omitted). Moreover, since the tenants raise this issue for the first time on appeal, this court can reverse only upon a finding of plain error.

*E.g., District of Columbia v. Wical Limited Partnership,* 630 A.2d 174, 182 (D.C.1993).

From the limited record before us, we can find no error at all in the court's instructions on damages, let alone plain error. The evidence established the exact amount of rent paid by each tenant plaintiff, and the judge carefully instructed the jury how to calculate the damages as a percentage of that rent. The jury never told the court that it was confused or in need of further instructions; on the contrary, the jury followed the court's instructions exactly. There is nothing in the record to suggest any confusion on the part of the jury or any instructional error on the part of the trial court.

### D. *The Verdict on the Implied Warranty Count*

The jury returned a verdict in favor of the landlords on the second count of the complaint, alleging a violation of the implied warranty of habitability in the tenants' leases. The tenants now urge us to reverse the judgment on the second count and to enter a judgment in their favor because they presented uncontroverted evidence that, in breaching the Voluntary Agreement, the landlords also violated the District of Columbia housing regulations.

The implied warranty of habitability entered our jurisprudence in *Javins v. First National Realty Corp., supra,* which extended to tenants contractual remedies for a landlord's breach of the lease. *Javins* held that "by signing the lease the landlord [assumes] a continuing obligation to the tenant to maintain the premises in accordance with all applicable law." 138 U.S.App. D.C. at 379, 428 F.2d at 1081. In fulfilling this duty, a landlord must remain in substantial compliance with the housing regulations, which, as they pertain to the warranty of habitability, require that a rented residence be maintained so as to provide decent living conditions for its occupants. *Id.* This duty, the court concluded, allowed tenants to assert the breach of this particular warranty as a defense to a landlord's suit for possession based on non-payment of rent. *Id.* at 380, 428 F.2d at 1082.

In *George Washington University v. Weintraub,* 458 A.2d 43 (D.C.1983), we extended the *Javins* holding, "ruling that the implied warranty of habitability 'may be used as a sword (to collect damages) as well as a shield (to contest the obligation to pay rent).'" *Id.* at 46 (quoting the trial court's memorandum opinion). We held accordingly that a tenant could rely on the landlord's breach of the implied warranty of habitability as the basis of an affirmative action for damages. *Id.* at 47. In so ruling, however, we recalled the warning of *Javins* that reliance on this warranty could not provide a basis for relief if the tenant failed to show more than a *de minimis* violation of the housing regulations. *Id.* at 47 n. 5 (citing *Javins,* 138 U.S.App. D.C. at 380 n. 63, 428 F.2d at 1082 n. 63). Thus we limited our holding in *Weintraub* by stating that "a landlord must exercise *reasonable care* to maintain rental premises in compliance with the housing code in order to fulfill the implied warranty of habitability." 458 A.2d at 49 (emphasis added).

In the case at bar, viewing the evidence in the light most favorable to the prevailing party, as we must,[12] we conclude that the tenants' claim of error is without merit. At trial, both Mr. Cowan and maintenance personnel testified that whenever they were notified of any problems caused by the installation of climate control units, Rittenhouse employees were promptly dispatched to investigate and make necessary repairs. Further, at no point during the conversion process, or thereafter, were the tenants hindered from using their apartments because of the failure of the new units to operate or any problems arising from their allegedly poor installation. From this and similar evidence, the jury could reasonably find that the landlords had exercised reasonable care to maintain the building in compliance with the housing regulations, and that any arguable violations of the regulations were *de minimis* and hence, under *Weintraub* and *Javins,* provided no basis for a finding of a breach of the warranty of habitability.

## IV. Conclusion

For the foregoing reasons, the judgment of the trial court is in all respects

*Affirmed.*

---

12. *E.g., Lewis v. Washington Metropolitan Area Transit Authority,* 463 A.2d 666, 669 (D.C.1983); *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C. 1982).