**DISTRICT OF COLUMBIA, Appellant,**

v.

**Paul H. ZUKERBERG, Appellee.**

**No. 03–CV–729.**

District of Columbia Court of Appeals.

Argued June 14, 2005.

Decided Aug. 11, 2005.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellant.

Patrick M. Regan, with whom Jonathan E. Halperin and Thanos Basdekis, were on the brief, Washington, DC, for appellee.

Before WASHINGTON, Chief Judge,* and RUIZ, Associate Judge, and KING, Senior Judge.

WASHINGTON, Chief Judge:

After a jury trial, plaintiff-appellee Paul H. Zukerberg ("Zukerberg"), serving as guardian ad litem for minor Jacob Miles–McLean ("Jacob"),[1] was awarded a 5 million dollar judgment in his negligence action against appellant-defendant District of Columbia ("District"). The District now appeals the trial court's denial of its motion for judgment as a matter of law, arguing that there was no factual foundation to support the jury's finding that the District's negligence proximately caused Jacob's injuries. We hold that the evidence at trial was sufficient to support the jury's finding of proximate causation, and, thus, we affirm.

I.

On June 18, 1999, Jacob, who was ten years old at the time, attended Family Swim Night with his mother, Robin Miles–McLean ("Ms. Miles–McLean"), and father, Stuart Miles–McLean ("Mr. Miles–McLean") at Wilson High School pool, a public pool operated by the District. That evening, Jacob suffered severe injuries as a result of his losing his balance and falling off the three-meter diving board onto the concrete deck below. The two-count complaint against the District alleged that the District was negligent for failing to "properly and adequately maintain, operate and supervise" the Wilson High School pool and for "failing to properly train" lifeguards at the pool.

At trial, one of appellee's central theories was that the District's failure to secure the three-meter diving board in a safe position violated the standard of care and caused Jacob to fall. Specifically, because the diving board's fulcrum was immovably frozen and rusted in the rearmost position, the diving board was in its most springy and wobbly condition, thus rendering it unsafe for non-competitive divers.

As Jacob was unable to testify regarding the cause of his fall, the only eyewitness to the accident was Ms. Miles–McLean. She testified that her son called out to her to watch as he prepared to jump off the board. Ms. Miles–McLean noted that, after climbing up the stairs, Jacob started to walk down the board. She continued:

And he walked toward the end like he had done before. And as he got toward the water he—I saw him lose his footing and he tried to catch himself, but he hadn't been holding onto the rail and so he reached for the rail that was right there.

Q: You're indicating with your left hand?

A: My left hand. And he panicked. I mean, he was on a 3 meter board and he was falling. And he was just grasping for that rail. And, you know, it's one of those things where in your mind it goes on forever, but you know it couldn't have. And I just—I just screamed. He landed on the deck. I think he hit head first.

. . . .

Q: At the time Jake fell, he had not yet passed the end of the handrails?

A: No.

Q: And he wasn't holding on?

---

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

1. Originally, Jacob's parents were the named plaintiffs in the trial court. During litigation, however, they substituted Zukerberg as sole plaintiff, personal representative, and guardian ad litem for Jacob.

A: No. If he had been holding on, he wouldn't have fallen.

Q: Was he doing anything, was he running, was he horsing around, was he goofing around?

A: All he ever did on the high dive was walk out to the end and jump off.

Q: And he was doing that?

A: He was doing that. He was just walking at a normal pace.

In addition to Ms. Miles–McLean, the appellee also presented the testimony of two experts in aquatic safety, Gregory B. Gordon ("Gordon") and Dr. Thomas Griffiths ("Griffiths"). Gordon was qualified as an expert on aquatics, aquatic safety, operation of municipal swimming pools and use of three-meter diving boards in recreational swimming facilities open to the public. At the time of trial, he was employed by the Maryland–National Capital Park and Planning Commission in Prince George's County. Previous to that position, Gordon had worked for the D.C. Department of Recreation and Parks for 24 years, ten of which he had actually managed the Wilson High School pool.

During Gordon's direct examination, he testified that it would be a violation of the national standard of care to have the fulcrum on a three-meter diving board set to the rearmost position during general recreational swim times. The examination continued:

Q: What does having a[sic] the fulcrum in that position do to this competition board that's there?

A: As soon as you start walking on this board, it was [sic] start moving.

Q: Can you tell the members of the jury if there's a national standard of care for the positioning of the fulcrum on such boards during open swim?

A: Yes, sir. Whenever you're open to the public for just general public swim,

the fulcrum should be in the up-front position. A lot of municipalities now, they lock it where the public can't move it. You can't just take your foot [on the fulcrum] and put it and it will move back.

Q: And if it's moved to the position where it's springy, what happens when a diver goes out on the board?

A: As soon as you start walking, it starts throwing you. It will start moving. Like it doesn't move sideways . . . just as you step, the movement, that board is going to start flexing.

\* \* \* \*

Q: Finally, Mr. Gordon, do you have an opinion, within a reasonable degree of professional certainty, as to the cause of Jacob Miles–McLean's brain injury and fall on June 18th, 1999?

A: Yes. Like I said, using the diving— the three-meter board at Wilson swimming pool with the fulcrum in the far back competition setting, that was a substantial factor. It makes the board extremely flexible.

As soon as you—as I stated earlier, as soon as you start walking from the back of that board, it starts moving. And I don't know—I've been trained to use it. It is very rare that I'll use a competitive board in the farth[ ]est back position.

Griffiths was the appellee's second expert on aquatic safety. As the director of aquatics and safety officer for intercollegiate athletics at Pennsylvania State University, he was qualified as an expert in the field of aquatics, aquatic safety, operation and management of municipal swimming pools and the safe use of three-meter diving boards for recreational swimmers, including children.

Dr. Griffiths stated that it would be a violation of the national standard of care to have the fulcrum on the three-meter diving

board set to the rearmost position during public use. In direct examination he testified:

Q: You've touched on this, but explain to us what the difference is between the fulcrum all the way back, as depicted in 2–A, the most springiest position, and all the way forward, as the standard of care and the Red Cross requires, what difference does it make?

A: Yeah, very easily. As soon as you get on that board, regardless of where you are, there's movement because it's very, very soft. It's relatively stable behind the wheel, behind the fulcrum. But as soon as—even though it moves— as soon as you get beyond that cross member that it's resting on, it begins to dip right away.

And these boards here, these waffle boards or cheese cake boards, for you to walk from the back end to the forward end, to walk would be difficult for you to do. Because as you're walking the board is bouncing. It's hard to visualize. I don't know if you can appreciate what I'm saying, but it's very, very flimsy.

At Penn State University my office over looks [sic] two 3 meter boards. And whenever I look out of the window, if you get a student, a college student, doing it for the first time often-times they'll grab the rail because it becomes so wobbly when they pass the fulcrum because they haven't been on a competitive board.

After deliberating, the jury found that the District deviated from the standard of care by: 1) failing to have a sufficient number of lifeguards at the pool; 2) failing to have a lifeguard supervising the use of the three-meter board; 3) failing to maintain the handrails free of rust; and 4) "allowing the three-meter diving board to be open for recreational use by children

and other patrons with the fulcrum in the rear[ ]most, springiest position." Of the various deviations from the standard of care, however, the jury found only the last breach was a proximate cause of Jacob's injuries.

The District moved for judgment as a matter of law both at the close of all evidence and after the jury returned its verdict. In its post-judgment motion, the District argued that the appellee "had presented insufficient evidence from which the jury could conclude without speculation that the position of the fulcrum had a substantial and direct causal link to Jacob's injury." In a written order, the trial court denied the District's motion for judgment as a matter of law. Regarding the issue of proximate cause, the court held that

plaintiff produced expert testimony that, when the fulcrum is in the back position, meant for competitive diving, a springy diving board like the one at Wilson High School starts to bounce and becomes wobbly as soon as one walks past the fulcrum. Hence, it is unsafe for those not trained in competitive diving—i.e., the general public—to use the diving board when the fulcrum is in that position. The danger is that an untrained person using the board will fall to the deck. A jury could reasonably have inferred that Jacob, particularly with his difficulty in maintaining balance, was caused to lose his balance by that wobbly, springy board, and fell to the deck.

The District appeals from this order.

## II.

On appeal, the District argues that the trial court erred in denying its post-verdict motion for judgment as a matter of law because there was no evidence to support the jury's determination regarding proxi-

mate cause. The District alleges that, although there was expert testimony regarding the national standard of care and a deviation from that standard, "there was no evidence as to how the fall *did* occur that permitted the jury to infer, without speculation, that the deviation was a cause in fact of the accident."

Zukerberg argues that, in the trial court, he presented "overwhelming evidence" in the form of direct, circumstantial and expert evidence that the District's violation of the standard of care caused Jacob's injuries. Specifically, he argues that his experts established that a zone of danger is created when the fulcrum of the board in question is set to its rearmost position, and that at this time the board will always wobble and bounce. Furthermore, he contends that Ms. Miles–McLean's eyewitness testimony regarding the "location, timing, and manner" of Jacob's fall supported the conclusion that Jacob was in the described zone of danger when he fell. Zukerberg argues that, viewing the evidence in the light most favorable to the plaintiff at trial, the evidence at trial "clearly permitted" the jury to conclude that the District's negligence was a proximate cause of Jacob's fall.

### III.

■ When reviewing a trial court's ruling on a motion for a judgment as a matter of law, we apply the same standard as the trial court. *Majeska v. District of Columbia,* 812 A.2d 948, 950 (D.C.2002). In reviewing the judgment, "this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict and should reverse only if no juror could reasonably reach a verdict for the opponent of the motion." *Grant v. District of Columbia,* 597 A.2d 366, 370 (D.C.1991). Furthermore, the nonmoving party is "en-

titled to the full effect of every legitimate inference [from the evidence] ... the question is not whether there is any evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party upon whom the *onus* of proof is imposed ...." *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979) (quoting *Shewmaker v. Capital Transit Co.,* 79 U.S.App. D.C. 102, 103, 143 F.2d 142, 143 (1944)). A directed verdict is appropriate where there is "no evidentiary foundation on which to predicate intelligent deliberation and reach a reliable verdict." *Papanicolas v. Group Hospitalization, Inc.,* 434 A.2d 403, 404 (D.C.1981).

■ "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *District of Columbia v. Wilson,* 721 A.2d 591, 600 (D.C.1998) (quoting *District of Columbia v. Watkins,* 684 A.2d 395, 402 (D.C.1996)). "This court has defined proximate causation as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.,* 350 A.2d 751, 752 (D.C.1976) (internal quotation marks omitted). " 'Proximate cause is generally a factual issue to be resolved by the jury,' however, it becomes a question of law 'when the evidence adduced at trial will not support a rational finding of proximate cause.' " *Majeska,* 812 A.2d at 950 (quoting *Washington Metro. Area Transit Auth. v. Davis,* 606 A.2d 165, 170 (D.C. 1992)). Furthermore, a plaintiff may meet his burden by offering either direct or circumstantial evidence. *See District of*

*Columbia v. Savoy Constr. Co.*, 515 A.2d 698, 708 n. 12 (D.C.1986).

Because the District conceded at trial that it breached the national standard of care by maintaining the fulcrum in its rearmost, springiest position, the only question before us is whether the appellee presented sufficient evidence to support the jury's finding that the breach was the proximate cause of Jacob's injuries. We evaluate whether Zukerberg met his burden by looking to the testimony of his fact and expert witnesses.

█ Through Gordon, Griffiths and Ms. Miles–McLean, Zukerberg established that 1) the placement of the fulcrum was a breach of the national standard of care; 2) the board moves as soon as you get on it because "it's very, very soft"; 3) once you pass the fulcrum, the board *always* wobbles and becomes unstable; 4) Jacob lost his footing as he began to walk down the board past the fulcrum and that, according to Ms. Miles–McLean, he was not running or "horsing around." Additionally, Gordon rendered his expert opinion that the fulcrum in the rearmost position was a "substantial factor" in causing Jacob's fall and subsequent injuries. We are satisfied that this evidence, viewed in a light most favorable to the appellee, was sufficient to support an inference that the negligent placement of the fulcrum caused Jacob to lose his balance and ultimately fall off the diving board. *See Rich*, 410 A.2d at 533 (finding case was properly submitted to the jury where photographs of two holes in the sidewalk coupled with plaintiff's description of her fall was enough to permit an inference that one of the holes was the cause of her fall).

The District argues that our decision in *Twyman v. Johnson*, 655 A.2d 850 (D.C. 1995), is controlling and mandates reversal of the trial court's judgment. In *Twyman*, the plaintiff sued her landlord for injuries sustained when she fell down stairs at her apartment, alleging that she fell because of the poor condition of the stairs. Twyman, who was the only witness to the accident, however, admitted at trial that "she did not know what had caused her fall . . . ." *Id.* at 853. Because Twyman could not link her fall to the defective stairs, we held that "the jury could not reasonably have decided that she fell, for example, because she stepped on a slippery or uneven stair tread—and *not* simply because she missed a step or lost her balance while not holding the guardrail (she was carrying a bag of trash at the time)." *Id.*

█ The District argues that, as in *Twyman*, there was no evidence in this case to support the jury's verdict. We disagree, and find *Twyman* to be distinguishable from the case at bar. In *Twyman*, we noted that the plaintiff "was required to present evidence sufficient to persuade a reasonable jury by a preponderance of the evidence that 'the breach of duty had a substantial and direct causal link to [her] injury.'" *Twyman*, 655 A.2d at 852 (quoting *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984)). Unlike the case at bar, Twyman admitted that she did not know the cause of her fall, and she failed to present any evidence at all which would reasonably support an inference that the defect caused her fall. Additionally, in *Twyman*, although the plaintiff presented an expert, the trial judge precluded the plaintiff's expert from rendering an opinion on causation for lack of factual foundation. In this case, unlike *Twyman*, Zukerberg produced evidence that supports a reasonable inference that the position of the fulcrum was the cause of Jacob's fall. Additionally, Gordon, Zukerberg's expert, also testified that the position of the fulcrum was a "substantial fac-

tor" in Jacob's fall.[2]

 The District also argues that the jury could have inferred many causes for Jacob's fall not attributable to the District, including Jacob's failure to use the handrails, his balance and coordination problems, or his "general tiredness." The District's argument, however, is without merit because "[f]rom the mere fact that the evidence permits two or more possible inferences, it does not necessarily follow that the evidence is not substantial and is not sufficient to sustain a jury's finding." *Seganish v. District of Columbia Safeway Stores, Inc.*, 132 U.S.App. D.C. 117, 120 n. 21, 406 F.2d 653, 657 n. 21 (1968) (quoting *Baltimore & O.R. Co. v. Postom*, 85 U.S.App.D.C. 207, 208–09, 177 F.2d 53, 54–55 (1949)). The plaintiff was not required to show that the negligent condition of the diving board was the only possible cause of the fall, or that injury must necessarily follow from its use, but that the negligence substantially increased the chances of the harm that resulted from the use of the board. *See Lacy v. District of Columbia*, 424 A.2d 317, 322 (D.C.1980) ("[T]he substantial factor test is properly applicable whenever there are concurring causes of a single injury, regardless of whether the

other causes are relatively passive or preexisting, such as a physical condition, or relatively active and occur subsequently, such as intervening negligent ... acts."); PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 270 (W. Page Keeton et al. eds., 5th ed. 1984); *see also* RESTATEMENT (SECOND) OF TORTS § 433 B cmt. b, illus. 3–5 (1965). Based on the evidence presented at trial, while the jury *could* have reasonably concluded that other factors, and not the position of the fulcrum, caused Jacob to fall off the diving board, the jury concluded otherwise and we will not disturb that finding on appeal as long as there is sufficient evidence to support it. Because we conclude that there was sufficient evidence of a causal link upon which a jury could make a finding of proximate causation in this case, the trial court's order denying the District's motion for judgment as a matter of law is

*Affirmed.*

**2.** Although the District contends that Gordon lacked a factual foundation to render his expert opinion on Jacob's accident, we find the trial court did not err in allowing the testimony. *See District of Columbia v. Anderson*, 597 A.2d 1295, 1300–01 (D.C.1991) (quoting *Pace v. Insurance Co. of N. Am.*, 838 F.2d 572, 578 (1st Cir.1988), for the proposition that there was sufficient evidence of causation even though the evidence supporting the expert's opinion rested upon inference). Gordon testified that he had reviewed the depositions of nearly everybody involved in the case, and had formulated his opinions based on his readings, his review of photographs, and his experience in aquatic safety, including his management of the Wilson pool for ten years.