**ESTATE OF Ronald D. KURSTIN, M.D., Appellant,**

v.

**John B.M. LORDAN, M.D., et al., Appellees.**

**No. 07–CV–1221.**

District of Columbia Court of Appeals.

Argued March 18, 2009.
Decided July 21, 2011.

---

Andrew H. Baida, Baltimore, MD, for appellant.

Patrick A. Malone, Washington, DC, for appellee.

Before RUIZ and FISHER,* Associate Judges, and FERREN, Senior Judge.

PER CURIAM:

This is an equitable contribution case derived from a medical malpractice action. The plaintiff and settling anesthesiologist entered into an unusual contractual arrangement to preserve the anesthesiologist's claim of contribution from the non-settling surgeon, but solely for the purpose of assigning that claim back to the plaintiff for her ultimate benefit. The non-settling surgeon contends that the settling parties had contracted that contribution claim away. Contrary to the trial court's ruling,

---

* Judge Kramer was on the division when the case was argued. Upon Judge Kramer's retirement on May 1, 2011, Judge Fisher was appointed to the division.

we conclude that the settling parties have the better argument, and thus we affirm.

## I.

Dr. Ronald D. Kurstin, whose estate is the appellant here, performed abdominal hernia repair surgery on Rosalee S. Blue and was assisted by the appellee anesthesiologist, Dr. John B.M. Lordan.[1] Blue was obese and ran certain risks during her operation, particularly the development of deep venous thrombosis, a condition that causes blood clots in the leg which can result in a potentially fatal pulmonary embolism. A type of drug known as a low molecular weight heparin is suitable for preventing blood clotting, and thus an internist recommended one such drug (Lovenox) for Blue's surgery. Although Lovenox is not an anesthetic, Kurstin directed Lordan to administer the drug during surgery, and Lordan did so, administering it intravenously after giving Blue, in addition to general anesthesia, a "spinal/epidural block" for pain control in lieu of the "pure epidural approach" she had been told she would receive. Lordan's evidence tended to establish through expert testimony reliant on applicable literature, as well as through the hospital's own mandatory policy, that a drug like Lovenox should not be administered until several hours after surgery. The Lovenox caused spinal bleeding that brought paralysis to Blue's right foot, impaired sensation and caused chronic pain in both legs, and brought loss of bowel control.

Blue sued Kurstin and Lordan for medical negligence as joint tortfeasors. On the first day of trial, counsel for Lordan and Blue disclosed the existence of an agreement between their clients providing (as characterized in court) for dismissal with prejudice of "all claims" by Blue against both Lordan and Kurstin. The agreement further provided, according to counsel, an "express reservation" by Lordan of the right to pursue "contribution/indemnification" from Kurstin. Additionally, Blue's counsel reported that he was now "switching hats" and would represent Lordan against Kurstin on a "cross-claim for contribution."

The jury trial for malpractice was therefore converted into a bench trial on Lordan's equitable cross-claim. After the close of the evidence, counsel for Lordan disclosed that under the settlement agreement Lordan had agreed to pay Blue $2 million. Furthermore, under the related agreement for Blue's counsel to represent Lordan against Kurstin (details of which Kurstin learned some weeks later), Lordan was to pay no attorney's fees or costs; he agreed to "fully cooperate" with counsel in bringing the contribution claim; and he retained no interest in any proceeds, all of which would be paid in full to Lordan's counsel. (Later, however, counsel reported to the court that the check from Kurstin's insurance company would be written to Lordan, who would sign it over to Blue.)

Pursuant to Super. Ct. Civ. R. 50, Kurstin filed a motion for judgment as a matter of law, which the court denied.[2] After the bench trial, the court issued findings of fact and conclusions of law stating that

---

1. Dr. Lordan's surgical practice group, Surgical Anesthesia Associates, PLLC, like Dr. Lordan, was a defendant and cross-plaintiff and is also an appellee. For convenience we refer to both as "Lordan."

2. Kurstin argued that Lordan's cross-claim must fail because Lordan lacked standing to pursue contribution; that Lordan could not substitute Blue as cross-plaintiff, as Blue had settled her claim against Kurstin; and that Lordan could not lawfully substitute counsel as cross-plaintiff, since such purported assignment of Lordan's claim would be contrary to law, champertous, and thus void.

Kurstin had breached the national standard of care and, as the proximate cause of Blue's injuries, was a joint tortfeasor. The court awarded Lordan $1 million from Kurstin as a *pro rata* contribution on the cross-claim (half the amount Lordan paid to Blue pursuant to their settlement).

Kurstin appeals the judgment, now arguing that: (1) the explicit terms of Lordan's settlement agreement with Blue prohibited Lordan from pursuing any claim against Kurstin because the settlement released both doctors—Lordan as well as Kurstin—"from all claims and demands of whatever nature," without reserving a claim for contribution; (2) a statement in the Blue/Lordan settlement agreement that Lordan was a "joint tortfeasor"—not being a judicial determination or a stipulation by all parties—was inadequate to justify Lordan's cross-claim against Kurstin; and (3) Lordan failed in any event to establish a national standard of care or to demonstrate that Lordan had violated such a standard.

Underlying Kurstin's individual arguments is the fundamental contention that Lordan's cross-claim was ultimately for the benefit of Blue, and so was barred by her release of all claims against both doctors. More graphically, explains Kurstin, because Blue obtained $2 million from Lordan for herself and another $1 million from Kurstin for her attorneys, Lordan is making "a laundered claim for additional damages brought on Ms. Blue's behalf to increase her recovery by $1 million, or 50%, in circumvention of the 'cardinal principle of law' that 'a plaintiff can recover no more than the actual loss suffered'" (citation omitted).

Lordan does not dispute that the cross-claim was ultimately for Blue's benefit. He asserts that Kurstin's premise—the contention that Blue's "actual loss suffered" was only $2 million—is bogus; Blue suffered much more. For that reason, argues Lordan, his settlement with Blue expressly reserved Lordan's right to pursue contribution from Kurstin—and to release all proceeds for Blue's benefit—as part of the consideration Lordan granted for Blue's willingness to settle with him for the partially compensatory sum of $2 million, not more. The decisional law from this jurisdiction, he insists, permits such reservation and related assignment of a contribution claim—end of case.

## II.

The first question is whether Blue, in releasing "all claims" against both doctors when she settled with Lordan, contracted away Lordan's claim of contribution against Kurstin.

### A.

■ The relevant provisions of the settlement agreement are as follows:

1. ***Release:** The Undersigned [Blue] hereby releases, acquits, and forever discharges the Released Parties [Kurstin and Jordan] and any other person, corporation, organization or entity from all claims and demands of whatever nature,* whether arising under tort or whatsoever contract theories or any federal, state or local law, actions and causes of actions, damages, punitive damages, costs, loss of service, attorneys' fees, cost of litigation, humiliation, embarrassment, mental anguish, injury to reputation, and money benefits or compensation of any kind on account of or in any way growing out of personal injuries, property damage, and/or death having already resulted or to result at any time in the future, whether or not they arise following the execution of this Agreement, as a result of and by reason of the Occurrence [Kurstin's and Lor-

dan's alleged malpractice]. [Emphasis added.]

\*　\*　\*　\*　\*　\*

5. **_Consideration:_** As consideration for the sums paid under this Agreement, the Undersigned [Blue] shall cause all of her claims in the case of _Rosalee S. Blue v. John B.M. Lordan, M.D., et al._ in the Superior Court for the District of Columbia, Case No.: 04–0006251 be dismissed WITH PREJUDICE as against all parties. _However, the Praecipe of Dismissal shall reserve the rights of John B.M. Lordan, M.D.,_ [_and related corporate entities_ ] _to prosecute a claim against Ronald D. Kurstin, M.D. and/or the Estate of Ronald D. Kurstin, M.D. for contribution._ [Latter emphasis added.]

\*　\*　\*　\*　\*　\*

14. **_Contribution Claim:_** The undersigned [Blue] acknowledges and agrees that John B.M. Lordan, M.D. [and related corporate entities] _have retained the right to pursue any claim for contribution, equitable contribution or any other similar claims_ that John B.M. Lordan, M.D., [and said entities] may have against Ronald D. Kurstin, M.D., and/or the Estate of Ronald D. Kurstin, M.D., as a result of this Settlement Agreement. [Emphasis added.]

Kurstin contends that, by releasing "all claims" against both Kurstin and Lordan in paragraph 1, Blue left no liability on Kurstin's part to which Lordan's alleged right of contribution could attach. Kurstin acknowledges that Blue expressly recognized Lordan's reservation of a contribution claim in paragraphs 5 and 14, but he insists that such reservation is hollow— that paragraph 1 trumps any right that Lordan may claim under those later provisions—because in releasing "all claims" against both doctors that pertained to her injuries, Blue could not simultaneously, and inconsistently, have left room for Lordan to sue Kurstin, especially when his suit was for the benefit of Blue.

Lordan replies that, in addition to Blue's release of both Kurstin and Lordan from all liability for her injuries, the settlement agreement expressly reserved Lordan's claim for contribution against Kurstin—a claim wholly separate from Blue's, and thus a claim that Blue could not, and did not, contract away.

■ When we focus solely on the parties' intent under the settlement agreement, as we must, _see, e.g., Lamphier v. Washington Hosp. Ctr.,_ 524 A.2d 729, 732 (D.C.1987), we are satisfied that Lordan's reading is the correct one. Clearly, the parties intended only the release of "all claims" by Blue against Kurstin and Lordan, leaving Lordan free to pursue his own, separate claim for contribution against Kurstin. Any other interpretation would cause paragraphs 5 and 14 to disappear from the agreement, rather than add meaning to it. This does not necessarily mean, however, that the parties' intent to preserve Lordan's claim for contribution was lawful, or that Lordan had legal authority to assign that right, or that under the circumstances it was assignable back to Blue—three issues we must address.

### B.

■ Both parties agree that the most relevant authority for sorting out legality here is an indemnification case, _Caglioti v. Dist. Hosp. Partners,_ 933 A.2d 800 (D.C. 2007). In that case, the plaintiff was initially injured when he was thrown to the ground by the malfunction of his electro-mechanical wheelchair. His injuries were aggravated by subsequent medical providers. He settled with the wheelchair manufacturer pursuant to an agreement whereby plaintiff discharged the medical

providers and the manufacturer from liability, in exchange for money payments, plus an assignment to the plaintiff of the manufacturer's equitable claim against the medical providers for "indemnification/contribution." The agreement further provided that, upon any recovery from such a claim, the plaintiff was obliged to pay 25% of the proceeds net of reasonable attorney's fees and costs to the manufacturer and its insurers. When the plaintiff pursued an equitable indemnification claim against the providers, rather than a medical negligence action, they challenged his right to do so. The trial court dismissed the suit with prejudice, ruling as a matter of law that the manufacturer could not assign the equitable indemnification claim to the plaintiff. The court perceived "seemingly contradictory terms" in an agreement that purported to discharge all the medical providers' liability while allowing plaintiff, even in the capacity of assignee, to sue them. Further, the trial court reasoned that plaintiff could not have intended to extinguish the providers' total liability because the manufacturer's payments did not fully compensate him for all his monetary damages, a prerequisite for an indemnification action. *See id.* at 806. That is to say, the very assignment of the indemnity claim was an acknowledgment that the monetary "payment alone had not made him whole." *Id.*

We reversed, holding that under the settlement agreement: (1) the manufacturer had retained the common law right to pursue the medical providers for equitable indemnification, (2) the manufacturer had lawful authority to assign that right, and (3) nothing precluded assignment of that right to plaintiff. In reaching the first conclusion, we explained the common law right of indemnity (including partial indemnity). *Id.* at 807–08. We then identified two prerequisites for an indemnity claim: the plaintiff must have released all

the medical providers from all liability, and must have received full compensation for the injuries. *Id.* at 808. As to the first, we rejected the defendants' argument, drawn from the trial court's rulings, that retention of an indemnification claim inherently contradicts the required release of all providers. We then read the settlement agreement to reflect plaintiff's intent to release all providers from liability while expressly reserving for plaintiff "the right to pursue an assigned indemnification claim." *Id.* at 810. Had we allowed the release language to trump the assignment provision of the settlement agreement, that interpretation, we said, would have rendered "a significant portion of the Settlement Agreement ... meaningless." *Id.* at 811.

As to the second prerequisite, that plaintiff must have received full compensation for the injuries, we concluded that the manufacturer's "promise to pay money to [plaintiff] *plus* the promise to assign its 'right' to pursue a claim for equitable indemnification (with the possibility of recouping additional money) together constituted full satisfaction of [plaintiff's] claims." *Id.* at 810 (footnote omitted).

Having concluded that the settlement agreement had preserved the manufacturer's indemnification claim, we then held, by reference to strong public policy established in the case law, that this claim was freely assignable, and that assignment of that claim to the plaintiff pursuant to the settlement agreement was allowable—indeed, "wholly consistent with prior decisions of this court favoring a policy of free assignability of claims," *id.* at 812 (citing *Brandenburger & Davis, Inc. v. Estate of Lewis,* 771 A.2d 984, 988 (D.C.2001)), unless the agreement "contains clear, unambiguous language prohibiting an assignment," *id.* at 811 (citation and internal quotation marks omitted).

Lordan relies heavily on *Caglioti*, finding "no real substantive difference between it and this case," despite *Caglioti's* focus on successor, not joint, tortfeasors; on indemnification, not contribution; and on a "structure of the assignment" different from the one we consider here. We agree with Lordan's reliance on *Caglioti* for these propositions:

■ —In the context before us, the distinction between a cross-claim for partial equitable indemnification and one for contribution among joint tortfeasors has no legal significance; each is intended to allocate financial responsibility equitably among parties responsible for the plaintiff's injuries. *See also District of Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332, 336, 340 (D.C.1998) (en banc).

—The policy favoring free assignability of claims applies equally to both remedies.

—If, to assure full compensation for injury, a settling tortfeasor can properly assign his indemnification claim to a plaintiff who has released all claims against a nonsettling tortfeasor, as we held in *Caglioti*, we see no principled reason why such an assignment should not be equally available to a settling tortfeasor who agrees to assign his contribution claim to the plaintiff against the nonsettling tortfeasor.

At this point, Kurstin's only rejoinder is to distinguish the "structure of the assignment" fashioned between Blue and Lordan from the one in *Caglioti*. This is a structure with only one principal difference. Rather than including the assignment of Lordan's contribution claim to Blue as part of her settlement agreement with Lordan—the approach taken in *Caglioti*—the Lordan/Blue assignment was contained in the separate letter agreement of even date between Lordan and Blue's counsel, in which counsel agreed to bring Lordan's contribution claim without fee, but with all proceeds payable to counsel (it was understood) for Blue's benefit.[3] Aside from stating that this assignment arrangement was not disclosed until after the trial of Lordan's contribution action—a statement of pique rather than prejudice—Kurstin, in the end, appears to use this distinction merely to reinforce the argument, rejected by *Caglioti*, that the assignment undid, and thus contravened, Blue's release of "all claims" against Kurstin.

■ To repeat: we reject that argument here. The fact that Lordan and Blue relied on two documents, not one, to create a *Caglioti*-like assignment is immaterial in the absence of demonstrable prejudice. And *Caglioti*, we can now say, confirms the legality of the Blue/Lordan arrangement here: (1) a plaintiff's complete release of two joint tortfeasors as consideration for payment of money damages by a settling defendant, (2) coupled with reservation of the settling defendant's claim for contribution (not just indemnification), (3) accompanied by assignment of the contribution claim back to the plaintiff as a way of, (4) achieving full consideration for the releases, that is, a package of money in hand plus a money claim calculated, in combination, to afford complete relief.

## III.

■ Lordan's claim of contribution, and its ultimate assignability to Blue, presuppose that Lordan has been sufficiently established as a joint tortfeasor—a status that Kurstin challenges on the ground that Lordan has not been judicially determined

---

3. The only other difference of note between the *Caglioti* and Blue/Lordan settlement arrangements is that, in *Caglioti*, 25% of the proceeds from the assigned indemnification action, net of legal fees and costs, were to be given over to the indemnitee. Kurstin does not make an argument based on this difference.

or stipulated by all parties to be a tortfeasor, as the law, he says, requires.

■■ We begin by noting, as this court has stated en banc, that "[a]n essential prerequisite for entitlement to contribution is that the parties be joint tortfeasors in the sense that their negligence concurred in causing the harm to the injured party." *Washington Hosp. Ctr.*, 722 A.2d at 336. We added that, "to be joint tortfeasors, it is sufficient if their independent acts combined to cause a single injury." *Id.* at 337. Furthermore, because this jurisdiction does not recognize the doctrine of comparative negligence, the "allowance of contribution under our rules is premised upon each tortfeasor being responsible for a single injury and sharing equally in making the injured party whole." *Id.* at 339.

Suppose, for example, that one of two allegedly negligent defendants settles with the plaintiff for $2 million; the other defendant elects to go to trial; and the jury renders a verdict against that co-defendant for $5 million. The threshold question is whether the settling defendant was jointly negligent and the proximate cause of plaintiff's injury. If the settler was—if, for example, the non-settler kept the settler in the case with a cross-claim for contribution and the jury found the settler negligent— then under our case law "the non-settling defendant is entitled to a *pro rata* [50%] credit against the verdict," *id.* n. 8 (citation omitted), leaving the plaintiff in our example with $4.5 million. If, on the other hand, the settling defendant's culpability was not established in court (or through an all-parties stipulation), then the non-settling defendant receives "a credit against the verdict in the amount of the settlement, dollar-for-dollar (*pro tanto* )," *id.* (citation omitted), bringing our hypothetical plaintiff the full $5 million the jury awarded, with the non-settling defendant paying $3 million instead of the $2.5 million the non-settler would have paid after a *pro rata* credit.

The foregoing discussion illustrates why it is critical in every case of alleged joint tortfeasors, when one settles and the other does not, to determine whether the settling defendant was culpable when a party seeks contribution from a settling defendant. In those situations, this court has sometimes stated—as Kurstin points out— that the "liability of the settling tortfeasor to the injured party must be judicially established." *Lamphier*, 524 A.2d at 733 (dictum). In making that statement, however, a division of this court relied on our decision in *Otis Elevator Co. v. Henderson*, 514 A.2d 784 (D.C.1986), where we affirmed a *pro tanto*, not *pro rata*, credit for the non-settler's benefit because the settler "expressly did not admit liability for the accident[,] [the non-settler] never cross-claimed against [the settler] for contribution, and neither jury nor judge ever considered whether [the settler] was liable for [plaintiff's] injuries." *Id.* at 786.

Later, in *Berg v. Footer*, 673 A.2d 1244 (D.C.1996), we observed that *Otis Elevator* had "intimated possible significance in the fact that the settling defendant 'expressly did not admit any liability for the accident.'" *Id.* at 1251 (quoting *Otis Elevator*, 514 A.2d at 786). We then stressed that "none of our decisions, ... in focusing on whether the settling defendant's liability had been adjudicated, ever had to determine whether an all-parties stipulation of the settling defendant's liability would be enough, in lieu of adjudication, to confirm that a [*pro rata* ], not a [*pro tanto* ] credit should be applied." *Id.* We concluded that the "case law focus," therefore, should be understood more properly to be on "whether the settling defendant's liability had been conclusively determined," *id.,* and held that "for purposes of applying the proper credit, a stipulation of the settling

defendant's liability by all parties is as effective as an adjudication." *Id.* We then reserved for future litigation how to deal "with a stipulation by only the plaintiff and a settling defendant or with other claimed substitutes for adjudication." *Id.* at n. 13.

Not long after *Berg,* this court considered an effort by George Washington University (GWU), as settling defendant (without admitting liability) in a medical malpractice action, to obtain contribution from the non-settling physician. *See Paul v. Bier,* 758 A.2d 40 (D.C.2000) (*Bier I* ). We ruled against the university on the ground that GWU's post-verdict motion to file a cross-claim was untimely. Not essential to decision, we noted "the absence of either a judicial determination or [an all parties] stipulation that GWU is a joint tortfeasor with [the non-settling physician]," *id.* at 44, while expressly acknowledging, with support from cited case law, that these two grounds for establishing joint tortfeasor status have been applied to "*a non-settling defendant* " seeking a *pro rata* credit from contribution, *id.* at 45 (emphasis added) (citing *District of Columbia v. Shannon,* 696 A.2d 1359, 1367 (D.C.1997); *Washington Hosp. Ctr.,* 722 A.2d at 336; *Lamphier,* 524 A.2d at 733 & n. 5).

Three years later, after the settlement with plaintiff and the verdict against the non-settling physician in *Bier I,* but before our decision in the appeal of that case, GWU filed a separate action for contribution on the same underlying facts as those in *Bier I* against the non-settling physician, in order to toll the statute of limitations. *See George Washington Univ. v. Bier,* 946 A.2d 372 (D.C.2008) (*Bier II* ). Again, we ruled against GWU, concluding that it would be inequitable to recognize the university's claim for contribution having rejected it earlier. In doing so, we continued "to reserve the issue of whether (and, if so, under what circumstances) a settling defendant has a right to contribution." *Id.* at 376. We added that, "[f]or the purposes of this opinion, we assume that a settling defendant does have that right, and that there must be some available 'procedural mechanism to establish the predicate joint tortfeasor liability, even though as a result of settlement, it is no longer party to the lawsuit' " (quoting *Bier I,* 758 A.2d at 46). By then we had issued our decision in *M. Pierre Equip. Co. v. Griffith Consumers Co.,* 831 A.2d 1036 (D.C.2003), a decision that the *Bier II* court characterized as affirming recovery of contribution by a settling defendant "[w]ithout mentioning our reticence" in previous cases to "resolve" how to determine whether a settling defendant who seeks contribution is a joint tortfeasor. *Bier II,* 946 A.2d at 376 n. 6.

The present case, therefore, is the first to address the question whether something less than a judicial ruling or an all parties stipulation can serve to establish a settling defendant's joint liability with the non-settling defendant for purposes of determining the settler's right of contribution against a joint tortfeasor. *Pierre Equipment* provides a vehicle for analysis. And it makes clear the important distinction between a settling defendant who seeks contribution—as in this case—and a non-settling defendant who does so.

Unlike all the other cases discussed above that have ruled on whether the settling defendant's status as a joint tortfeasor has been conclusively determined by court ruling or otherwise, *Pierre Equipment* is the first to rule on the merits of a claim for contribution by the settling defendant against the non-settler, not the other way around.[4] In that case, the

---

4. As indicated above, although *Bier I* and *Bier* *II* concerned a settling defendant seeking con-

plaintiffs converted their home heating from oil to natural gas. The defendant contractor, however, left the pipe for receiving the oil on the outside of the house, and the defendant oil company, whose driver mistook the address for his delivery, poured oil into the plaintiffs' home (now converted to gas), to their substantial damage. The contractor settled for $850,000 in an agreement that also discharged the non-settling oil company from liability. The settling contractor then sued the oil company for contribution. The jury rendered a verdict for the settler but found that a reasonable amount for the settlement would have been $600,000, not the $850,000 the settling contractor paid—a verdict that resulted in a *pro rata* contribution of $300,000 from the oil company. The trial court had instructed the jury that it "must determine not only [1] whether [the non-settling oil company] was liable to the [plaintiffs] because it was negligent and that negligence was a proximate cause of the oil spill into their basement, but also

whether the settlement between the [plaintiffs] and [the oil company] was reasonable." 831 A.2d at 1039.

On appeal, we sustained the trial court's two-element instruction. We rejected the settler's argument that "the trial court should have followed a traditional damages procedure, requiring proof of the specific damages the [plaintiffs] could have recovered against [the oil company]," *id.* at 1038, rather than "instruct[ing] the jury to determine whether the [$850,000] was a reasonable amount," *id.* No question was raised at trial or on appeal as to the settler's informally presumed status as a joint tortfeasor. In a factual situation similar to *Pierre Equipment*, we have that question now.

In the present case, in his settlement agreement with Blue, Lordan acknowledged that he was "a joint tortfeasor."[5] The question then becomes, more specifically, whether a settling defendant can es-

tribution from its co-defendant, we ruled against the settler on grounds unrelated to elements of required proof, and we expressly reserved the issue now before us. In two earlier cases, this court considered claims for contribution by a settling defendant, but we remanded in each for further consideration of the facts. *See Taylor v. Tellez*, 610 A.2d 252 (D.C.1992); *Early Settlers Ins. Co. v. Schweid*, 221 A.2d 920 (D.C.1966).

**5.** If Blue had settled with Lordan alone and kept her suit against Kurstin alive, that would not have provided a forum in which Lordan's negligence could have been judicially determined unless Kurstin, anticipating an advantage, kept Lordan in the case by impleading him through a cross-claim or by relying on " 'a special jury verdict request' to determine the settling defendant's status as a joint tortfeasor." *Berg*, 673 A.2d at 1250 n. 9 (quoting *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 186 (D.C.1990)). (How this would work is unclear, unless it were a motion, served on Lordan, that likely would induce him to appear rather than watch what hap-

pens.) Kurstin, moreover, might or might not have been willing to stipulate that Lordan was a joint tortfeasor, depending on how Kurstin evaluated whether a *pro rata*, rather than *pro tanto*, credit would bear on the sum he thought he ultimately would have to pay. That decision, of course, would depend on whether Kurstin had all the information necessary to inform his choices.

In this case, Kurstin apparently did not learn the full terms of Lordan's settlement with Blue until after the trial for contribution, including the $2 million payable to Blue. It does not appear, however, that counsel sought help from the court to obtain a copy earlier or even to learn the dollar amount involved. We know only the following from a footnote in Kurstin's opening brief: "Dr. Kurstin's counsel requested a copy of the settlement agreement on the first day of trial, but was told by Dr. Lordan's counsel, Mr. Malone, that the agreement had not been finalized, even though the agreement was signed by Ms. Blue and witnessed by Mr. Malone on February 2, 2007, several days prior to the beginning of trial."

tablish a claim for contribution by acknowledging joint tortfeasor status in its settlement with the plaintiff, as Lordan has here, coupled with *Pierre Equipment's* requirements: "establishing the liability of the non-settling tortfeasor, and the reasonableness of its settlement with the injured person(s)." 831 A.2d at 1039.

■ The answer is yes, with a caveat. In the first place, a substantial settlement with the plaintiff, as in this case, while not in itself necessarily an admission or proof of the settler's negligence, becomes a *prima facie* showing of negligence when the settler admits liability as the predicate for seeking contribution. Although settlers will often disclaim liability for various reasons, it is unlikely—absent a showing of collusion or fraud—that a non-negligent individual or entity would admit liability and offer a substantial bundle of dollars to an injured party as a mere volunteer.

■ Second, in putting on evidence to establish both the non-settler's liability and the reasonableness of the settlement figure, as required by *Pierre Equipment*, the settling defendant will have to present enough of his own role in the incident to prove the required reasonableness of the settlement. The settler will have to show that his conduct was culpable enough to warrant the figure he agreed to pay—a showing that may or may not require expertise to buttress his admission of liability at the value he accepted, but surely a showing that will leave no doubt about the settler's culpability as a joint tortfeasor, and consequent liability for all of the injured party's damages. *See Pierre Equipment*, 831 A.2d at 1039.

Finally, in this particular case, rather than rebut Lordan's *prima facie* showing

of his own liability for negligence causally contributing to Blue's injury, Kurstin took the position throughout the trial that Lordan was the sole responsible tortfeasor,[6] a litigation strategy tantamount to stipulating Lordan's culpability. For all these reasons, therefore, Kurstin has no tenable basis for challenging Lordan's status as a joint tortfeasor entitled to seek contribution.

■ As to the caveat, a few words on burden of proof are now in order. *First,* because the settling defendant/cross-plaintiff must establish that he or she is a tortfeasor, the settler has the burden of persuasion to do so. *Second,* the admission of liability in a formal settlement agreement, coupled with valuable consideration payable to the injured plaintiff, establishes, as we have said, a *prima facie* showing we hold sufficient to shift the burden of production to the non-settler who would question the settler's status as a joint tortfeasor. *Third,* because the settler has the burden to prove reasonableness of the settlement (subject to reduction for failure of proof), the settler will present in court evidence which the non-settler may attack with a view to rebutting (if desired) the settler's *prima facie* showing of culpability, as well as the reasonableness of the settlement. *Finally,* the factfinder, properly informed about the parties' respective burdens of persuasion and production, can be asked to resolve separately, if contested, whether the settling defendant/cross-plaintiff was a joint tortfeasor.

■ It is important, finally, to make clear that Lordan's admission of joint responsibility for Blue's injuries is corroborated by the reasonableness of his settle-

---

6. Kurstin acknowledged on deposition that he and Lordan made a "joint decision" to administer Lovenox to Blue, but he offered rea-

sons why Lordan's actions should make him a superseding cause of Blue's injuries, thereby relieving Kurstin of liability.

ment with Blue, as the court found.[7] Blue filed a complaint seeking damages of $5 million but reduced that in her pretrial statement to $3 million for future medical and caretaking needs, plus $114,500 in medical expenses and $160,000 in lost earnings, exclusive of "[p]ain, suffering, and loss of enjoyment of life." Thus, a strategy for Blue that aimed for recovery of $3 million or more, based on a $2 million settlement with one doctor plus assignment to Blue of settler Lordan's claim for contribution from the non-settling doctor, was not at all unreasonable from Blue's point of view, especially as a way of avoiding an unpredictable jury trial for medical negligence. Based on these numbers, however, was Lordan's settlement reasonable within the meaning of *Pierre Equipment?*

 Even if by paying $2 million, Lordan can be said, initially, to have given Blue approximately a $500,000 premium on what a joint tortfeasor should have to pay, *pro rata,* if the verdict reached $3 million, he could anticipate a credit from his contribution claim against Kurstin—a credit that ultimately would have reduced his total payout to $1 million—except for his agree-

ment to pay his contribution credit over to Blue. That was Lordan's choice, however, so the focus for reasonableness does not factor in fairness to Lordan.[8] The concern, rather, is for the impact of settlement on the non-settling defendant. As we noted in *Pierre Equipment,* in quoting from the RESTATEMENT OF THE LAW (SECOND) TORTS, § 886A (contribution among tortfeasors):

> *Unreasonable settlements.* In particular, when a tortfeasor without suffering a judgment against him has voluntarily made a settlement with the plaintiff and a payment that exceeds any amount that would be reasonable under the circumstances, he should not be permitted to inflict liability for contribution regarding the excess upon another tortfeasor who has not entered into the same settlement.

831 A.2d at 1039. As *Pierre Equipment* itself recognizes, the factfinder can establish the proper amount of recovery, and thus cut back the credit that a settling defendant can obtain against the non-settler.

Despite his many arguments for non-liability, Kurstin did not contest the rea-

---

7. In paragraph 89 of the trial court's findings of fact and conclusions of law, that court states: "The amount of the settlement has been stipulated as reasonable." Earlier, in paragraph 8, the court stated: "The reasonableness of the settlement amount is not disputed," followed by the following footnote: "Notwithstanding Defendant's stipulation to the reasonableness of the settlement, their post-trial motion seems to challenge the reasonableness of the settlement. In view of Ms. Blue's injuries, the Court, if called upon, would find the settlement to be just and reasonable."

In Kurstin's post-trial Memorandum in Support of Motion for Judgment as a Matter of Law, counsel explained that, believing the claim for contribution was strictly for Lordan's benefit, rather than for the benefit of Blue, who had "dismissed all claims she had

*with prejudice,"* Kurstin's counsel "then agreed to a stipulation of a key component of a contribution claim (i.e., the fairness and reasonableness of the settlement) in order to protect the now-deceased Dr. Kurstin's estate from any and all exposure to a potential judgment in excess of insurance coverage."

8. Many factors can influence a decision to settle and the amount of the settlement: counsel's pre-trial assessment of the evidence that would be presented at trial, including a party's ability to present expert evidence; the cost of litigation; and other, less quantifiable concerns, such as the desire to avoid adverse publicity and the diversion of attention and resources from more productive endeavors. Some of these might affect one defendant, but not another, in their respective assessments of the reasonableness of a settlement.

sonableness of the Blue/Jordan settlement at trial. See note 7, *supra*. Nor could he. In concluding that "Dr. Kurstin is a joint tortfeasor who is liable for one-half of the settlement by Dr. Lordan and his employer," the judge implicitly calculated injuries to Blue totaling $2 million, of which Kurstin paid only $1 million upon Lordan's receipt of a $1 million *pro rata* credit. Kurstin would have paid less (meaning zero dollars under the circumstances) only if the judge had found him not liable, or if Lordan's status as a tortfeasor was not established (resulting in a $2 million *pro tanto* credit to Kurstin). Under the circumstances, therefore, Lordan's settlement with Blue was reasonable under *Pierre Equipment.* That Blue, through her settlement, arguably received a recovery on the high side from Lordan does not undermine that conclusion, for one cannot seriously argue that Blue received a windfall at Kurstin's expense.[9]

## IV.

▮▮▮▮▮ In order to establish the liability of the non-settler (Kurstin) as a joint tortfeasor, Lordan was required to establish an applicable national standard of care, Kurstin's deviation from that standard, and a causal relationship between that deviation and Blue's injury. *See Burke v. Scaggs*, 867 A.2d 213, 217 (D.C. 2005). Kurstin maintains that Lordan failed to establish the national standard of care that he has charged Kurstin with violating. In review of this bench trial, we

may not set aside the judgment except for errors of law "unless it appears that the judgment is plainly wrong or without evidence to support it." *Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 101 (D.C. 2007).

The trial court found that Kurstin had violated the national standard of care in the administration of Lovenox—a standard requiring a delay in its use until several hours (typically six to twelve) after surgery, contrary to its use while Blue's surgery was taking place. For that standard Lordan's expert witness relied upon, among other sources, warnings and public health advisories from the Food and Drug Administration; guidelines from the American Society of Regional Anesthesia; the warning labels and instructions included with Lovenox; and extensive studies of the relationship between Lovenox and deep venous thrombosis.[10] The evidence showed that intra-operative administration of Lovenox could "cause bleeding and lead to injuries of the spinal cord" with harmful results of the kind suffered by Blue.

Kurstin argues that this testimony is deficient because counsel failed to lay a foundation sufficient for the expert to give his opinion at trial, and that the evidence is irrelevant in any event because, although it may apply to anesthesiologists, it does not extend to surgeons. It follows, says Kurstin, that he cannot be held legally responsible, as the "captain of the ship," for the negligence of the anesthesiologist in carry-

---

9. While attacking Lordan's claim for contribution as "a laundered claim for additional damages brought on Ms. Blue's behalf," Kurstin does not attack Blue's overall $3 million recovery of $2 million from Lordan and $1 million from Kurstin (with $1 million paid over to her counsel) as a violation of the "one satisfaction rule." *See Berg*, 673 A.2d at 1255–57. In any event, as we concluded in *Berg, id.,* the "one satisfaction rule" does not always apply.

10. It is interesting to note, although apparently not before the trial court, that the product information for Lovenox is published in the Physicians Desk Reference, which this court has recognized as "both prima facie evidence of the standard of care and physicians' notice of their contents." *Garvey v. O'Donoghue*, 530 A.2d 1141, 1146 (D.C.1987).

ing out Kurstin's orders. The trial court rejected these contentions, and we agree that none is persuasive. Extensive expert testimony supports the court's findings, in compliance with the words of a recent decision of this court, that the "expert must explicitly indicate the *basis* for his or her knowledge of the national standard of care, state what the national standard of care is, and provide a basis for his or her opinion testimony that another doctor has deviated from that standard." *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 328 (D.C.2007).

Contrary to Kurstin's contention, moreover, the applicable national standard is not limited to one explicitly directed at surgeons. A physician who prescribes a particular drug, indifferent to the method of its administration as the court found here, cannot rationally argue for protection against negligence simply because an association governing his own specialty does not expressly address that drug. An omission of that kind cannot shield a physician from a claim for negligence based on generally available warnings from reliable sources—as specified above—that the procedure he prescribes for its use is contraindicated. *See generally Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 182–83 (D.C.1990). Furthermore, Sibley Hospital, the site of Blue's operation, had a widely distributed, mandatory policy requiring doctors to wait two hours before administering Lovenox after the epidural catheter had been discontinued. Even Kurstin's own expert testified, and the trial court found, that a surgeon had responsibility to know the hospital policies on the drugs the surgeon orders.[11] Kurstin conceded on deposition, however, that he was unaware of the Sibley policy and decided when to use Lovenox based on his own experience.

Finally, as the trial court concluded, Kurstin cannot succeed by arguing that he had a right to rely on Lordan's expertise as an anesthesiologist to the point of his own legal exoneration from negligence he attributes to Lordan in administering the drug incorrectly (an argument, by the way, that cements Kurstin's recognition that Lordan was a tortfeasor). While Kurstin characterizes this reliance as an argument that precludes a finding of negligence, we are satisfied that the trial court's findings and conclusions that Kurstin was negligent in ordering administration of Lovenox during surgery are amply supportable on this record. His argument implicating Lordan must succeed, if it all, under his final contention: that Lordan, not Kurstin, was the sole, superseding legal cause of Blue's injuries.

## V.

Kurstin contends, more specifically, that even if he committed a breach of the national standard of care, his actions were not the proximate cause of Blue's injuries; they were superseded by Lordan's negligence. Again, we sustain the trial court's ruling to the contrary.

Lordan did not have to establish that Kurstin was the only cause of Blue's injury. *See, e.g., District of Columbia v. Zukerberg*, 880 A.2d 276, 283 (D.C. 2005). More than one person can be a legal or proximate cause of an injury, provided that the individual's action is a substantial factor in bringing about the injurious result. *See, e.g., id.; Nat'l Health Labs. v. Ahmadi*, 596 A.2d 555, 557 (D.C. 1991). In this case, but for Kurstin's re-

---

11. The trial court also observed that, under District of Columbia law, "violation of a hospital's own policy is evidence of negligence," citing *Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries v. Perotti*, 136 U.S.App.D.C. 122, 419 F.2d 704 (1969).

quest for Lordan to administer Lovenox during Blue's operation, in violation of the national standard of care, Lordan would not have done so. As the trial court found:

> Whether or not Dr. Lordan, the anesthesiologist, should have challenged the order and should have administered the drug by a different route than the one he chose, Dr. Kurstin is not relieved of his liability as a joint tortfeasor for setting in motion the premature and inappropriate use of this drug.

It is true that Lordan administered the drug intravenously, rather than subcutaneously, after giving Blue a spinal/epidural rather than the pure epidural that Blue and Kurstin may have anticipated. Certainly the first, and arguably the second,[12] of these decisions was contraindicated, and, according to the trial court, Kurstin at least was partly responsible for the intravenous route because he should have known but failed to check on how Lordan intended to proceed. However, even if Kurstin should not be held responsible for these decisions by Lordan, Lordan's actions in no way eliminate Kurstin's negligent order for Lovenox during Blue's operation as a substantial factor that foreseeably caused her injuries. *See Snyder v. George Washington Univ.*, 890 A.2d 237, 246–47 (D.C.2006) (stating criteria to establish legal causation). As the trial court concluded: "the conduct of Dr. Lordan does not meet the criteria for a 'superseding cause' that would relieve Dr. Kurstin from liability."

\* \* \* \* \* \*

For all the reasons set forth above, the judgment of the trial court is affirmed.

*So ordered.*

---

**12.** Richard Katz, M.D., an expert witness for Kurstin, testified that the spinal needle was a contributing cause of Blue's injuries. Furthermore, Charles David Goldman, M.D., an expert called by Lordan, testified about "neurologic complications when the Lovenox was used in combination with certain types of anesthesia, namely the epidural and the spinal anesthesia." The trial judge, however, stated that "there was no testimony that Dr. Lordan acted negligently in choosing spinal anesthesia or in his technique with the spinal needle, much less that his use of the spinal needle was extraordinarily unforeseeable, which would be necessary to establish that the spinal needle was a superseding cause."